**COMMUNITY CHEVROLET, INC.,**
Plaintiff,

v.

**GENERAL MOTORS CORPORATION,**
Inc., Defendant.

Civ. A. No. 65–731.

United States District Court
D. Massachusetts.

Dec. 17, 1965.

Frederick G. Fisher, Jr., Hale & Dorr, Boston, Mass., for plaintiff.

Edward B. Hanify, Ropes & Gray, for defendant.

CAFFREY, District Judge.

This matter came before the Court on plaintiff's motion for a preliminary injunction. Plaintiff, Community Chevrolet, Inc., brought this action against General Motors Corporation for alleged violations of the Automobile Dealer Franchise Act, 15 U.S.C.A. 1221 et seq., and the Robinson-Patman Act, 15 U.S.C.A. 13(d) and (e); it seeks damages in the amount of Four Million Dollars and permanent injunctive relief.

This cause of action is basically the same as that set out in Civil Action 65–641–W, a prior case between the same parties which Chief Judge Wyzanski dismissed on September 22, 1965.

At the hearing held on this motion defendant contended that the suit should be dismissed on the ground that it had been commenced and was being prosecuted by attorneys not authorized to appear on behalf of the plaintiff and that, in any event, injunctive relief is not warranted.

Plaintiff called no witnesses in support of its motion and chose instead to submit affidavits by Julius W. Weiner, Eliot Y. Klasky, and Stephen Feingold. A second affivadit by Feingold and a letter from Kenneth A. Korb, Esq. to the Middlesex County National Bank were subsequently filed. In addition, the parties stipulated in open court that the affidavits, memoranda of law, transcript of hearings, and other papers filed in Civil Action 65–641–W are to be considered a part of the file in this case. At plaintiff's request the parties were given time to file memoranda of law in support

of their respective positions and these memoranda have been filed.

The events which give rise to this suit span about five years of the operation of Community Chevrolet, Inc. as a franchised Chevrolet dealer. Submission of the case on conflicting affidavits makes it impossible to resolve contested factual issues and therefore difficult to get a true picture of these events. The following statement of facts, of course, serves only as a basis for ruling on the motion for a preliminary injunction.

From the papers filed in the case it appears that Nathan Weiner first began operations of Community under its franchise agreement with General Motors in 1952. By 1959 Community had incurred substantial liabilities to the Middlesex County National Bank and the General Motors Acceptance Company. Julius Weiner, Nathan's brother, states in his affidavit that he attended a conference with the City Manager and Zone Manager of Chevrolet in late 1958 or early 1959 at which he proposed to supply the financing necessary to maintain Community provided he received some assurance that Community's franchise would be renewed in 1960. He further states that the representatives of General Motors gave him such assurance.

The affidavit filed on behalf of General Motors by Hugh G. Moore contains a copy of a memorandum from General Motors' records which corroborates this story. The memorandum, prepared by H. G. Lackey, the Boston zone manager of Chevrolet in 1959, deals with a conference on January 12, 1959 at which Lackey, E. A. Hetzer, the city manager of Chevrolet, and Nathan and Julius Weiner were present. According to Lackey, Community's financial problems were the subject of the meeting. Lackey's position at the meeting was that if Nathan worked out his difficulties with GMAC and the bank and provided adequate working capital for the dealership, there was no reason why Nathan could not continue as a Chevrolet dealer. At the request of Julius Weiner, Lackey explained the financial policies of General Motors and the financial operating requirements for dealerships.

It appears that some time between this meeting and the renewal of Community's franchise, Julius Weiner did provide financing for Community and, on January 26, 1961, the Chevrolet Motor Division of General Motors entered into a Dealer Selling Agreement with Community Chevrolet, Inc. for a term ending October 31, 1965. As with prior agreements between the parties, this agreement was executed on behalf of Community by its president, Nathan Weiner, and provided in part that:

"THIRD: This Agreement is a personal service contract, and is entered into by Chevrolet with Dealer in reliance upon and in consideration of the personal qualifications of and representations with respect thereto of the following named person or persons who, it is agreed, will substantially participate in the ownership of Dealer and/or will actively participate in the operation of Dealer's Chevrolet dealership:

| Name | Participating in Ownership | Participating in Operation |
|------|----------------------------|----------------------------|
| Nathan Weiner | X | X |

For the purposes of this Agreement the person or persons designated above shall be responsible for any act or omission of any of Dealer's agents or employees which may be contrary to the purposes and objectives of this Agreement or to any provision of this Agreement.

Concurrently with the execution of this Agreement, Chevrolet has endorsed its approval of the ownership, financial interests and active management of Dealer as represented by Dealer on a 'Dealer Statement of Ownership, Financial Interests and Active Management' form supplied by Chevrolet. No change in such ownership, financial interests or active management of Dealer shall be made without the prior written approval of Chevrolet. Any such approved change shall be evidenced by

the execution of a revised 'Dealer Statement of Ownership, Financial Interests and Active Management'."

There is nothing unusual about events up to this point: a dealer in financial difficulty turned to his brother for additional financing, obtained it, and renewed his dealership agreement. It appears, however, that a major reorganization of Community took place on May 1, 1961. Apparently various obligations of Community and of Sterling Commercial Corporation, an automobile leasing business operated by Nathan Weiner, along with loans that had been guaranteed by Julius Weiner were all consolidated under an agreement with the Middlesex County National Bank. Malden Equipment Corporation, a corporation owned and controlled by Julius' wife, Anne B. Weiner, became the principal obligor under this agreement, and Julius, Nathan, and Nathan's wife Sylvia, guaranteed the obligations. The 99 shares of stock in Community held by Nathan and the one share held by Sylvia were pledged to the bank as collateral security for the $533,230 loan of May 1, 1961 which was the subject of the above agreement. Nathan and Sylvia delivered the stock certificates representing their shares in Community to the bank.

In addition, and apparently as consideration for the assumption of the obligations of Nathan, Sylvia and Community by Malden Equipment Corporation, Nathan and Sylvia executed a series of written stock assignments which were absolute in terms and which purported to transfer all their right, title and interest in Community's stock to Malden Equipment, subject to the pledge to the bank.

Shortly thereafter, according to the affidavits of Julius Weiner and Stephen Feingold, Nathan left Community and took no active part in its operation from the spring of 1961 until May of 1962. Feingold further states that Nathan returned to Community in May 1962 and devoted a part of each business day to its operation until February 1964. Both Julius and Feingold claim that Feingold was the active manager of Community throughout this period and that since representatives of General Motors periodically inspected the premises and discussed matters relating to the operation of Community with Feingold during this period, General Motors knew that Feingold, rather than Nathan Weiner, was actually in charge of Community's operations.

General Motors, on the other hand, maintains that no one with managerial responsibility at General Motors was informed that Feingold rather than Nathan Weiner was operating Community until March 2, 1964. On that day, according to the affidavit of Hugh G. Moore, then Boston zone manager for the Chevrolet Motor Division of General Motors, Nathan Weiner came to Moore's office. He told Moore that he had been living under the burden of having his brother dictate every move to him for the last three years, and was unable to operate the dealership properly; that Julius had forced him to hire Julius' son-in-law Feingold, that Julius had moved Julius' construction company into Community's building and taken over the office space, and had forced Community to use the construction company's accountant. In addition, according to Moore, Nathan said that Julius had determined upon a policy of harassment for the purpose of forcing Chevrolet into giving the dealership selling agreement to Julius and his son-in-law Feingold. Nathan Weiner states in his affidavit that he did not reveal the degree and nature of Julius' interference with his operation of the dealership to anyone connected with the Chevrolet Division of General Motors until some time in March of 1964. General Motors took the same position on this point in June of 1964 in a letter to Community.

In any event, the fraternal dispute which had been seething apparently since 1961 came into the open in February 1964. In that month Julius made the first attempt to have the Dealer Selling Agreement changed by General Motors. He proposed that Feingold be substituted

for Nathan Weiner as the person named in paragraph THIRD of the agreement as the operator of Community. This proposition was apparently made to Mr. Hetzer on February 11, 1964 and again to Mr. Moore on February 26, 1964.

General Motors refused to agree to any such change and since that time has consistently refused to accept either Julius Weiner or Stephen Feingold as proposed operators of Community. Feingold's affidavit states that in reply to the proposal Hetzer said that Feingold would not be acceptable because he lacked sufficient experience in the automobile business. The Feingold affidavit continues as follows:

> "(Hetzer) stated further that if Nathan could not operate Community, probably no replacement Chevrolet dealership would be located at Malden since General Motors desired to reduce the number of dealerships in the Greater Boston community because the competition in this area was particularly great."

Feingold says he was "shocked and surprised" at General Motors' refusal to name him as its dealer, not to mention General Motors' anti-competitive sentiments.

According to Moore's affidavit, his position at the February 26 meeting was that both Julius Weiner and Feingold were unacceptable to General Motors, that if Nathan wanted to get out of the business he should give General Motors a letter to that effect and they could then select a new dealer, and that if Nathan decided to continue the dealership additional funds would be needed to put the dealership on a sound operating basis.

It appears that shortly after this meeting Nathan left Community. Moore states in his affidavit that he first learned of this when Nathan Weiner came to his office on April 2, 1964 and told him that he had been ordered out of the business by his brother right after the February meeting and had not received any salary or expenses from Community since then.

Some time in May of 1964, Roy M. Cash, an Assistant General Sales Manager at Chevrolet, met with Julius Weiner. As had Hetzer and Moore, he turned down Julius' proposal to award the dealership to Feingold. The Middlesex County National Bank, which is apparently the principal creditor of Community, had discussions with representatives of General Motors in an attempt to work out a solution that would prevent the loss of Community's franchise and the consequent decrease in the value of the stock in Community that the bank held as collateral security for the loan referred to above.

Finally, on June 9, 1964, General Motors by letter notified Community that it had elected to terminate Community's Dealer Selling Agreement, effective June 30, 1964, unless Community came up with a satisfactory program for the continued operation of the dealership. In taking this action General Motors relied specifically on Section 18(b) (4) of the agreement, which gives General Motors the right to terminate the agreement immediately in the event of, among others,

> (1) the removal, withdrawal or elimination from the dealership of any person named in paragraph third of the agreement; (2) the sale or transfer of any interest in the direct or indirect ownership or active management of the Dealer without the prior written approval of Chevrolet; and (3) any dispute between officers of the dealer which may adversely affect the operation of the Dealer.

As a result of further negotiations this termination was not put into effect. Community agreed to restore Nathan to his position as President and operator of Community. In addition, the Middlesex County National Bank released 25 per cent of the capital stock of Community to Nathan. Malden Equipment also released its interest in the stock. These releases were subject to the condition that if the Chevrolet franchise were at any time terminated, the stock would be returned to the Bank and would be

subject to any claims which Malden Equipment or the Bank was releasing. Furthermore, the stock could not be transferred by Nathan without first being offered to Community Chevrolet.

By letter dated June 29, 1964, General Motors stated that on the basis of these representations by Community it had decided not to terminate Community's franchise. General Motors pointed out that Nathan Weiner must in fact have full control over the operations of Community, and that, although it would have been .General Motors' preference not to have Stephen Feingold on the board of directors, since this might imply a continued effort on the part of Julius Weiner and Feingold to control the dealership, Feingold's presence on the board, without more, would not be objectionable. General Motors reiterated its position that it was dissatisfied with Community's capitalization and stated that it was foregoing termination of the dealership only because the creditors of Community had requested that it do so. After stating that General Motors would not insist upon Community's being recapitalized, the letter continued, "However, it should be particularly understood that it is Chevrolet Motor Division's current intention not to offer Community Chevrolet, Inc. a new Chevrolet Dealer Selling Agreement when the term of its current Chevrolet Dealer Selling Agreement expires on October 31, 1965."

On June 30, 1964, the board of directors of Community voted to accept the conditions contained in the letter of Mr. Moore dated June 29, 1964.

Both General Motors and Nathan Weiner assert in affidavits that Nathan never in fact resumed operational control of the dealership after June 30, 1964. Feingold states that Nathan has been actually present on the premises of Community no more than a dozen times since June of 1964. and that he, Feingold, has been actually operating the business.

On June 4, 1965, Zone Manager W. L. Lawlor notified Community that Chevrolet Motor Division would not offer it a new Chevrolet Dealer Selling Agreement when the current one expired on October 31, 1965, and no new Chevrolet Dealer Selling Agreement has been executed subsequent to October 31, 1965.

General Motors' notice that it did not intend to renew Community's franchise agreement triggered an intensification of the family dispute among the Weiners referred to above and destroyed any remaining semblance of orderly management of the affairs of Community. The basic dispute between Julius and Nathan was over the question of who owned the stock in Community. Nathan claimed that the 1961 transfers were merely for purposes of providing Malden Equipment Corporation with a security interest in the stock of Community in return for Malden's assumption of Community's obligations. Julius, on the other hand, maintained that the 1961 transfer was an outright sale of the stock. Since the Middlesex County National Bank had never released possession of the stock certificates after their delivery to the bank to secure the loan of $533,230, the certificates still stood in the names of Nathan and Sylvia Weiner and, accordingly, on the books of Community Chevrolet, Nathan and Sylvia were still listed as the record owners of the stock in the corporation.

This dispute over the ownership of the corporation has carried over into the prosecution of this suit against General Motors. Nathan Weiner's position is that the suit has no chance of success and that since General Motors' cooperation in the sale of the dealership to another party is necessary to realize the full value of the assets upon the expiration of Community's franchise, the suit can only hurt Community by antagonizing General Motors. Julius Weiner, on the other hand, wants Community to prosecute the suit in an attempt to retain its franchise. This basic disagreement over the best course for Community to adopt has resulted in a bitter struggle for control of the corporation, characterized by separate stockholders meetings by the two factions, the election of different di-

rectors and officers of the corporation by the two factions, and purported directors meetings by the different boards of directors. The affairs of the corporation are in such disarray that the first suit filed by Community was dismissed by Chief Judge Wyzanski on the grounds that the attorney who purported to represent Community had not received proper authorization from the corporation. The question of the ownership of the stock in Community is in litigation in the state courts and a decision has been handed down by the Superior Court holding that Malden Equipment Corporation is the true owner of the stock in Community. The record before me does not indicate whether or not an appeal to the Massachusetts Supreme Judicial Court will be taken from this decision of the Superior Court.

It will not be necessary at this stage of the case to discuss the question of the authority of Frederick G. Fisher, Jr., Esq. to represent the plaintiff which is raised by the defendant's motion to dismiss. It suffices for present purposes to note that plaintiff has failed on the present state of the record to make a showing that there is a likelihood that it will prevail on the merits of the main portion of the case, normally a prerequisite to the granting of a preliminary injunction in anti-trust cases. On the contrary, the present state of the file in this case tends to indicate at least two breaches of the Dealer Selling Agreement on the part of plaintiff, the removal of Nathan and the sale of Nathan's stock in Community, either of which would afford the defendant a legal basis both for terminating the prior contract, had defendant elected to do so, or for declining to enter into a new contractual relationship with Community under the aegis of Julius Weiner or Stephen Feingold.

Plaintiff requests an injunction that would force General Motors to deal with Community even though the ownership of the corporation is the subject of litigation in the state court, the authority of those who claim to be the directors of the corporation is challenged, and the position of president and chief executive of the company is claimed by both Feingold and Nathan Weiner. There is nothing in the provisions of the Automobile Dealer Franchise Act, or any reported opinion construing the Act, that has been called to the Court's attention which requires, or even supports, the granting of such an injunction on the basis of the inconclusive affidavits before this Court.

Motion for preliminary injunction denied.