180 N.J. Super. 522 (1981)
435 A.2d 1167
ALLEN F. SIMMONS AND ANN B. SIMMONS, HIS WIFE, PLAINTIFFS,
v.
GENERAL MOTORS CORPORATION, OLDSMOBILE DIVISION, DEFENDANT AND THIRD-PARTY DEFENDANT-APPELLANT, AND WILLIAM PERRETTI, DEFENDANT AND THIRD-PARTY PLAINTIFF-RESPONDENT, AND SIMMONS OLDSMOBILE, INC., INTERVENOR AND THIRD-PARTY PLAINTIFF-RESPONDENT, AND A.M.S. INC. AND DAVID E. LAHTI, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued January 6, 1981.
Decided August 11, 1981.
*524 Before Judges BOTTER, KING and McELROY.
Michael Waters argued the cause for appellant (Carpenter, Bennett & Morrissey, attorneys; Otis M. Smith, General Counsel, and Robert B. Weiss, of the Michigan Bar, and Thomas L. Morrissey of counsel; Rudy B. Coleman, Rosemary J. Bruno and Linda B. Celauro on the brief).
Melvyn H. Bergstein argued the cause for respondents (Margolis, Bergstein & Schiffman, attorneys; Martin G. Margolis and Melvyn H. Bergstein of counsel; Richard G. Berger, on the brief).
The opinion of the court was delivered by BOTTER, P.J.A.D.
*525 This appeal concerns the right of General Motors Corp. (GM) to terminate an Oldsmobile motor vehicle dealership franchise held by Simmons Oldsmobile, Inc. (Simmons Olds) whose stock was sold to William Perretti without GM's approval. The principal focus of this appeal are provisions in the final judgment entered in the Chancery Division on November 27, 1979 which allowed Perretti to sell the dealership within six months' time to someone acceptable to GM notwithstanding that the trial judge found that GM had been justified in rejecting Perretti as a GM dealer. In a letter dated December 3, 1979 expanding and explaining his oral opinion, the trial judge stated that he held that "it was clear that Mr. Perretti was unacceptable to General Motors Corporation as a dealer-operator, if for no other reason than he held five Chrysler franchises and had a `bad reputation.' A rejection for these reasons `seem[s] reasonable as a business [j]udgment.'" However, in his oral opinion the judge had held that because there was "procedural unfairness" in GM's handling of Perretti's application for approval as a dealer-operator, Perretti would be given the right to transfer the dealership to someone else. In his letter opinion the trial judge found that Perretti could take back a mortgage in an effort to "just get out and get the best he can out of his investment," even if the mortgage would constitute a continuing financial investment in the dealership.
On this appeal GM contends that the trial judge exceeded his authority in ordering the continuation of the Oldsmobile franchise even for these limited purposes. Perretti did not file a cross-appeal. The trial judge also held binding the sale from plaintiffs (Simmons) to Perretti of the stock in Simmons Olds as well as the sale of real estate to A.M.S. Inc., a corporation owned by Perretti. The sale of these properties was not conditioned on GM's approval of Perretti as a dealer. Accordingly, plaintiffs' attorneys have advised that they are not participating in the appeal since they prevailed below (in upholding the unconditional sale of their property) and the appeal concerns *526 issues related only to GM, Perretti and the Simmons Olds corporation.[1]
After receiving notice of the sale of the stock in Simmons Olds to Perretti and of the sale of the business premises to A.M.S. Inc., GM notified Simmons on April 16, 1969 that the Dealer Sales and Service Agreement pursuant to which GM had granted a franchise to Simmons Olds would be terminated on May 2, 1979. On May 1, 1979 plaintiffs instituted this action naming as party defendants GM, its zone manager, David Lahti, William Perretti and A.M.S. Inc. Plaintiffs alleged that GM's attempt to terminate constituted a breach of contract with *527 Simmons and violated the Franchise Practices Act (act), N.J.S.A. 56:10-1 et seq. Plaintiffs also charged that Lahti had interfered with their contractual relations and legitimate prospective economic advantage and expectations. Plaintiffs sought an injunction to prevent the termination of the dealer agreement, and, in the alternative, a declaration that if the franchise could be lawfully terminated by GM that the agreement by which the stock and business premises were sold to Perretti and A.M.S. Inc. would continue in full force and effect. Money damages were also sought against GM and Lahti.
On the same day that the complaint was filed, the trial judge authorized Simmons Olds to intervene in the proceeding, and an order to show cause with temporary restraints was issued enjoining GM from implementing the termination of its dealer agreement with Simmons Olds and from discontinuing shipments of automobiles and other products to Simmons Olds. The order also provided that Perretti and A.M.S. Inc. were to continue to conduct and manage the business and business premises of Simmons Olds. On June 21, 1979 the restraints were continued pendente lite. GM's motions for leave to appeal from this order and for summary disposition were denied by this court.
Thereafter, Perretti and A.M.S. Inc. filed their answer to the complaint and, in the same pleading, Simmons Olds filed a third-party complaint against GM alleging that GM's action in seeking to terminate the franchise was unreasonable and arbitrary and contravened the Franchise Practices Act. Simmons Olds demanded judgment against GM compelling it to issue a new franchise to Simmons Olds naming William Perretti as owner-operator. In the same pleading Perretti alleged a third-party complaint claiming that GM interfered with the present and prospective economic advantage of Perretti and demanding damages against GM.
The case came on for trial in October 1979, at the conclusion of which the trial judge entered an oral decision. The judgment entered on November 27, 1979, reflecting that decision, may be paraphrased as follows:
*528 1. The action against Lahti was dismissed with prejudice.
2. GM had no absolute right to reject Perretti's application as a dealer-operator.
3. As of October 31, 1979, the date of the trial judge's decision, Perretti "is deemed rejected by [GM] as dealer-operator of Simmons Oldsmobile ... such designation pursuant to Paragraph Third of the Dealer Selling Agreement."
4. The contracts effecting the sale of stock of Simmons Olds to Perretti as well as the sale of real estate by plaintiffs to A.M.S. Inc., and the deed effecting the transfer of the real estate, constitute valid transfers and are binding upon plaintiffs and Perretti as well as A.M.S. Inc.; said transfers were adjudged not contingent on GM's acceptance of Perretti as a designated dealer-operator.
5. The sale of stock and dealership facilities "are not to be deemed and shall not be treated as grounds for termination" of the franchise, and said franchise shall continue to be held by Simmons Olds subject to the further provisions of the judgment.
6. For a period of three months Perretti and GM may undertake to find a dealer-operator candidate acceptable to GM for the acquisition of the stock of Simmons Olds and for the real estate and other assets as may be tied in with the general transaction, at a price that is satisfactory to plaintiffs and Perretti. Simmons Olds and Perretti have a right during this period to try to get the "best deal" they can. If, on January 31, 1980, there is an unaccepted and outstanding offer which would allow Simmons and Perretti to recoup their investment and the dealer-operator is acceptable to GM, said offer shall be deemed accepted and shall be specifically enforced.
7. In the event the parties fail within the three-month period to effect a sale and there is no outstanding offer as specified in paragraph 6, Perretti and GM may undertake to find a dealer-operator acceptable to GM for a further three-month period terminating on April 30, 1980.
*529 8. In implementing the foregoing, GM shall make a good faith determination of acceptability of a dealer-operator applicant.
In the event no transfer is accomplished pursuant to paragraphs 6 and 7, the franchise shall be terminated. All other claims were dismissed with prejudice, and the injunction was continued for the purpose of effectuating the provisions of the judgment. This appeal followed.
In large part the facts in the case are clear and uncontroverted. On June 1, 1973 Allen Simmons, who was then the owner-operator of an established Toyota dealership in Ramsey, New Jersey, entered into a Dealer Sales and Service Agreement with GM whereby Simmons Olds became a franchised Oldsmobile Motor Vehicle Dealer. Apparently the relationship proved satisfactory and on November 1, 1975 GM and Simmons Olds, the dealer corporation of which Allen Simmons owned 100% of the stock, entered into a renewal of the Dealer Agreement. Simmons testified that he was named in the agreement as the only person designated as the dealer-operator or dealer-owner, and he ran the business until the sale to Perretti in 1979. The dealer or franchise agreement expressly provided in paragraph 3 that Allen F. Simmons would be the dealer-owner and dealer-operator, that the dealer-operator will actively manage the franchise, and the dealer-owner will own beneficially and of record the entire interest in the dealership as indicated in a management and ownership addendum executed simultaneously.
The second paragraph in the agreement contains the dealer's undertaking to maintain dealership operations in accordance with the provisions of paragraph 3 of the agreement. It provides that the dealer recognizes that it has been granted a franchise "in reliance upon the undertaking of the Dealer, and not of any third party or parties, to fulfill the responsibilities herein described...." Subparagraph (b) of the third paragraph of the agreement provides:

*530 It follows from the provisions set forth in subparagraph (a)(2) above that this Agreement shall be construed as being in the nature of a personal service agreement. Dealer acknowledges and agrees that, except as otherwise provided in this Agreement, Dealer may continue to enjoy the benefits to be derived from the Franchise and Related Rights only so long as Dealer is, and continuation of the business relations between Oldsmobile and Dealer established by this Agreement are conditioned upon Dealer being, managed and owned as provided herein.
Throughout 1976 and 1977 Simmons Olds was operated smoothly and successfully. In fact, with GM's approval, on January 1, 1977 the dealership was moved to larger quarters in the same municipality. Then, in the spring of 1977, Simmons, upon solicitation of an offer of a "better deal" by Mr. Rehill of the Trust Company of New Jersey, Jersey City, changed his financing arrangements from the Midlantic Bank to Rehill's bank. However, by January 1978 Simmons began experiencing financial difficulties in the form of cash flow problems with the new bank that was handling his floor plan financing. According to Simmons, this was caused by delays in financing retail contracts sent to the bank for discounting. The cash shortage ran as high as $125,000 at times. The bank also "would take a car check every week, sometimes twice a week instead of the usual once a month that we had enjoyed in the years previous," Mr. Simmons testified. This also interfered with the inventory carried by Simmons Olds.
In September 1978 Rehill and another bank representative visited the dealership premises and gave notice that Simmons Olds was "out of trust" and would be placed on a limited financing basis. This would restrict Simmon Olds to financing only for cars that were sold and not cars ordered for inventory. Despite the injection of additional funds, Simmons could not prevent the further decline in his business. He testified that inventory restrictions prevented him from maintaining sales volume that would make the dealership profitable. In early October he was told by Rehill to find another financing institution. He testified that he advised GM's zone manager, Lahti, of his problems, but Simmons was unable to obtain substitute financing. Finally, on February 23, 1979, Simmons Olds was *531 "out of trust" for a substantial sum and was told by the Trust Company of New Jersey that the bank would foreclose unless additional funds were produced by the end of the business day on Monday, February 26.
On February 26 Lahti and two other GM representatives visited the dealership premises at the request of Simmons to discuss his financing problems. Lahti asked if Simmons was interested in selling and stated that before he could do anything he needed a letter from Simmons expressing that intention. A letter was prepared and delivered that afternoon. Lahti also suggested that Simmons contact a Tony Mennella, another Oldsmobile dealer, who might be interested in acquiring the franchise.
When Mennella returned Simmons' call later that day, Simmons told him that a prospective purchaser had already been located. The person with whom Simmons was negotiating was William Perretti, an experienced dealer who apparently had the financial means to complete a deal by the bank's deadline. Negotiations with Perretti were commenced around 11 a.m. on February 26. While these negotiations were going on, Lahti had returned to his office and prepared a response to Simmons' letter of intent to sell the dealership. Lahti's reply was dated the same day and advised Simmons that GM acknowledged the letter of intent but that any change in dealer operation or ownership would require GM's prior approval. This letter was of no help to Simmons; it largely restated GM's rights under the Dealer Agreement and offered GM's cooperation. However, Perretti told Simmons he could "handle" the bank, and the bank did not foreclose before agreement was reached with Perretti.[2]
*532 Written contracts were signed on February 27, 1979 and the closing took place the next day, February 28. Perretti bought the stock in Simmons Olds which held the Oldsmobile and Toyota franchises. The real property was conveyed to a corporation controlled by Perretti. On the same day, Simmons resigned as an officer and director of Simmons Olds. The Trust Company of New Jersey was notified of Perretti's acquisition of the Simmons Olds stock and that he would control the funds in the Simmons Olds bank account. Both Simmons and Perretti knew that Perretti would have to get GM's approval to operate the Oldsmobile dealership. However, in a deposition Perretti testified that he did not remember if he had told Simmons, prior to signing the purchase agreement, that he "had applied recently for a Buick franchise in Monmouth County, New Jersey, and had been rejected...." Perretti's agreement to purchase a GM Buick dealership, the Bonnie Buick-Opel agency, was conditioned on getting approval from Buick, but Perretti was not approved and the agreement was cancelled.
On or about March 1, Mr. and Mrs. Simmons left for Florida and stayed there until April 20. With Simmons in Florida, Lahti had difficulty learning how Simmons resolved his financial problems with the bank. On March 6 Simmons told Lahti by telephone that he had sold the dealership to Perretti, and he described the terms of the transaction. Later that same day a Mr. Bell called and told Lahti that he and Perretti had "invested" in Simmons Olds and that he was the new general manager. Asked if he and Mr. Perretti had executed a buy-sell agreement *533 with Mr. Simmons or had purchased the corporation from Simmons, Bell said, "Not to my knowledge."[3] Lahti told Bell that this conflicted with information he had received and suggested that he and Perretti be prepared to divulge truthfully what had transpired. An appointment was made for later in the day, and Perretti and Bell went to Tarrytown to see Lahti. Perretti said he was operating Simmons Olds. Lahti sold them of his conversation with Simmons and asked if it was true that Simmons had told the corporation and the business premises to Perretti. Perretti replied that he and Simmons "had reached an agreement" but that "the transaction had not been closed as of that date." Perretti asked for a franchise application. Lahti gave Perretti the forms and advised that it would take approximately three weeks to evaluate his application. Perretti said he owned four Chrysler dealerships in northern New Jersey and Rockland County, New York, and referred to some he owned in Texas. He said he was also in the horse racing business and had substantial investments in horses. Lahti testified that he told Perretti that GM would continue to do business with the dealer entity until such time "as we were able to resolve the ownership question."
After this meeting Lahti endeavored to reach Simmons in Florida without success. On March 22, 1979 Lahti received Perretti's application for the dealership, but it was returned to Perretti's attorney the same day since GM had not been notified in writing by Simmons regarding a change in ownership. However, Lahti did retain a copy of Perretti's application. On March 23, 1979 Lahti received a letter from Simmons' attorney, Robert Dilts, which was described as the "franchisee's notice of intent to transfer" the Simmons Olds dealership to Perretti, the "proposed *534 transferee." The letter said the notice was sent pursuant to N.J.S.A. 56:10-6 et seq.
In response to this letter Lahti called Dilts and said he needed proper notice from Simmons before he could act on the proposed sale. Lahti said he also needed a statement signed by Simmons that Dilts did in fact represent him. A letter to this effect was received by GM on April 9. The letter said nothing about the Perretti transaction  merely that GM could deal with Robert Dilts, Simmons' attorney, "in all aspects of the business of Simmons Oldsmobile, Inc."
By letter of April 16, 1979 GM notified Simmons Olds that its dealership agreement was terminated, effective 15 days later, on May 2, 1979, because of violations of the agreement. (As noted above, this termination was stayed by the restraining order issued on May 1, 1979.) The following provisions of the dealership agreement are pertinent:
A. Termination of Agreement
(2) Termination Due to Acts or Events Controlled by Dealer, Its Management or Owners
Each of the following represents an act or event that is within the control of or originates from action taken by Dealer or its management or owners and over which Oldsmobile has no control but which, when it occurs or takes place, is so contrary to the spirit, nature, purpose or objectives of this Agreement or of specific provisions thereof as to warrant its termination:
(a) The removal, resignation, withdrawal or elimination from Dealer for any reason of any Dealer Operator or Dealer Owner.
(c) Any attempted sale, transfer or assignment by Dealer of this Agreement or any of the Franchise or Related Rights granted Dealer under the provisions of Paragraph FIRST of this Agreement; or any attempted transfer, assignment or delegation by Dealer of any of the responsibilities assumed by Dealer under the provisions of Paragraph SECOND of this Agreement.
(d) Any sale, transfer, relinquishment, voluntary or involuntary, by operation of law or otherwise, of any interest in the record or beneficial ownership of Dealer without the prior written approval of Oldsmobile.
(e) Any change in the management of Dealer, as set forth in the Management and Ownership Addendum, without the prior written approval of Oldsmobile.
(g) Any sale or other transfer, by operation of law or otherwise, to any third party or parties, or any relinquishment or discontinuance of use by Dealer, of any of the Dealership Premises or other principal assets that are employed and required by Dealer in the conduct of the Dealership Operations.
*535 Notwithstanding the foregoing notice, after the complaint was filed, Perretti's application was processed and, by letter of May 16, 1979, it was rejected. The letter of rejection states that Perretti was found unqualified as a GM dealer; it referred to the "inordinately high number of consumer sales and service complaints" generated by Perretti's four other dealerships in comparison with other agencies in the same area. In addition, the letter cited Perretti's other business activities that would prevent his compliance with the agreement's requirement of personal attention on a day-to-day basis. Testimony in the case given by the Bergen County Director of Consumer Affairs revealed that Lahti had visited her office and was furnished information about consumer complaints relating to Perretti's two dealerships in Bergen County. Similar information was obtained concerning Perretti's dealership in Passaic County. Perretti's dealerships were described as the worst in the area in terms of sales and service complaints. Lahti reported that "bait and switch" tactics were used, as well as renegotiating price on delivery, and even nondelivery in some cases where the "gross is low." Other information later came to Lahti's attention which supported GM's disapproval of Perretti, including a fine of $5,000 paid to the State of New Jersey for false advertising.
The trial judge held that GM had no absolute right to terminate the Simmons Olds dealership. He found that Lahti should have been aware of Simmons' desperate condition of February 26; that as early as February 28 GM knew or should have known of Perretti's involvement; that on March 6 Simmons told GM he had sold the dealership to Perretti, but GM was not satisfied with that information because of Perretti's "unfortunate ... evasive answer" to Lahti's inquiry. While the judge said that Perretti's response may have entitled GM to draw "certain conclusions about Mr. Perretti," the judge expressed dissatisfaction with GM's handling of Perretti's application.
We have some difficulty ascertaining from the trial judge's opinion what GM did wrong. The judge referred to GM's knowledge that Perretti was operating Simmons Olds; he referred *536 to the March 23 letter from Dilts (which spoke of an intent to transfer the dealership to Perretti as the "proposed transferee"), to GM's return of Perretti's application to him while keeping a copy "which they acted upon at a later date without advising Perretti that they were, in fact, acting on it," and to the fact that after the lawsuit was filed GM investigated Perretti in one day and rejected his application. The judge then said: "The Court is not necessarily pleased with the timing of the various steps by General Motors." He went on to say at various points in his decision that Perretti knew of the requirement of approval by GM, but optimistically hoped or believed he would be approved. Continuing on, the judge said:
He [Perretti] was a financially successful non-GM dealer. All that in fact was done by General Motors initially all the way up to May 10th led Perretti to only one of two conclusions, either he was going to be accepted or he was going to be rejected. If he was rejected, in due course I think it was reasonable to assume that as businessmen it would be logical for either he, Mr. Simmons, or he, Mr. Perretti, to be able to ... peddle the dealership somewhere else and get out from under  formally, to recoup their investment, even under the terms of the General Motors' contract.
He could not have known and did not know of the interoffice memos passing between Lahti and Lansing, the technical decisions made by General Motors and/or the attorneys solidifying their position under the formality of the contracts in existence. All he knew is that he was operating. He had money invested and he had an application pending.[4] He ran the dealership. He sold vehicles and he did not know until May 16th, 1979 that GM had even decided to act on his application, much less that he had, in fact, been rejected.
What the trial judge apparently found procedurally unfair in GM's conduct was not promptly rejecting Perretti and advising him that they would not approve him. The judge said:
... despite my finding of procedural unfairness by General Motors and the lack of knowledge given to Mr. Perretti and despite the fact that I think General Motors should have advised him much earlier that they were going to reject him because it's obvious that they were going to reject him from the very beginning as soon as they knew who he was and a little bit about him, despite all of those conclusions, I will not impose upon General Motors the obligation of accepting someone who they would have had the right to reject had they done it properly, but their failure to afford procedural due process brings into play many *537 equitable principles and will affect the ultimate remedy that the Court will frame in this case.
Thus, I find that while Perretti is not covered as such by the Franchise Act, the Act, nonetheless, requires that fundamental due process and fundamental fairness be shown prospective dealer-operators, not only in processing the application but in the procedure for rejecting that application.
........
Perretti saved Simmons Corporation which was and is the dealer. Even if he is not entitled to be substituted as dealer-operator, he is entitled to moral, fair and just treatment. The fact that there were many complaints, the fact that he was advertised in the Record as Wild Bill Perretti, the fact that he... did not meet the standards of General Motors, may all be justification for rejecting him as a dealer-operator, but they are not justification for procedurally manipulating him. Even a criminal is guaranteed procedural and due process and basic fairness and while I may agree with many of the statements made by Mr. Morrissey in his summation about the inappropriate statements and the actions of Mr. Perretti, nonetheless, General Motors must be, in dealing with Simmons and with Simmons Corp. above a reaction to such statements or actions by Mr. Perretti.
........
I therefore find that there is no absolute right to reject by General Motors and what I mean by an absolute right is just that, they have a right to exercise their discretion, they may set up their business standards, they may take into consideration financial ability, how many dealerships they want any one man to have, whether a man has a bad reputation with the Bergen County Consumer Department or not, they may take all of these into consideration and if they, in their discretion, handled without discrimination, come to the conclusion that this man should not be a General Motors dealer-operator, that business judgment, if fairly made and if handled procedurally correct, has to be and must be sustained.
........
I find the procedures here utilized by General Motors fundamentally unfair, but even that is unimportant since this Court has no right, as I indicated earlier, to pass upon anything but the exercise of discretion. I do find that there was no fair exercise of discretion by General Motors but would note that the fact that Perretti was rejected, does not shock the Court. I can understand General Motors rejecting a man who had the Perretti background. That doesn't shock the Court. And I am not happy about the way they did it. But the fact that they arrived at the conclusion is not surprising to the Court.
........
But the return of the application, the lack of giving Mr. Perretti any knowledge, the stalling  is the only way I can put it  the legal manipulation, the one day investigation, all with the sole purpose of justifying that which they could have done if they had handled it properly, does not sit well with this Court. *538 It does not, however, take away, as I indicated before, the right of General Motors to reject Perretti.
Perretti took the risk. He knew that General Motors had to approve him. He has been rejected, albeit without a fair, procedural hearing or procedural steps.
........
Mr. Perretti was an experienced man. He lost in his optimistic hope, optimistic gamble that he would be accepted as a GM dealer. He will gain no windfall through this action but neither will he be punished.
The trial judge concluded as follows:
Summing up, the contract between Simmons and Perretti [is] valid and binding as between them. The contract between Simmons and Perretti is not to be deemed and cannot be treated as a grounds for termination. Failure to get GM approval for Perretti is a technical breach of the franchise agreement. Both Simmons and Perretti knew they were doing the wrong thing. But the remedy is not termination as indicated by Perretti, but the remedy is one that is afforded by this Court, a chance to resell with a limited time period to do so and on terms. Fundamental fairness was lacking in the General Motors' approach. And even though it is not necessary to decide the same, I do conclude, since I have been asked to find it, that there is no right to an absolute rejection by General Motors  that they must exercise their discretion fairly and properly and I do find as indicated earlier that the rejection of Mr. Perretti under the facts existing would be sufficient.
Two concepts were expressed by the trial judge in forming his opinion. One is that a franchisee has the right to recoup his investment even if the franchisor has the right to terminate the franchise. This concept has recently been supported by our Supreme Court in Westfield Centre Service, Inc. v. Cities Service Oil Co., 86 N.J. 453 (1981). The other is that GM did not give prompt notice to Perretti of its intention to reject him as a transferee and, therefore, although GM had good business reasons to reject Perretti, the rejection would be effective only as of the date of the court's decision, giving Perretti an opportunity from that time on to resell the franchise for the best price he could get within the six-month maximum time limit set by the court. Thus, the trial judge said:
The corporation, Simmons, marches on. It has the franchise. Perretti is deemed rejected as of this day by General Motors. I hold that being so, a reasonable opportunity must be given to the corporation to continue and not lose whatever interest it has in the franchise and to Messrs. Simmons and Perretti to come out whole, a fair chance.
Now, that really means Perretti because as between Perretti and Simmons I find that contract binding and valid.

*539 I
The trial judge said that the transfer of the franchise by Simmons to Perretti without prior approval by GM was simply a "technical breach" of the franchise agreement. This is at most a casual interpretation of the law. The transfer occurred without prior notice of an intention to make the transfer, contrary to N.J.S.A. 56:10-6. This section of the Act provides, in part:
It shall be a violation of this act for any franchisee to transfer, assign or sell a franchise or interest therein to another person unless the franchisee shall first notify the franchisor of such intention by written notice setting forth in the notice of intent the prospective transferee's name, address, statement of financial qualification and business experience during the previous 5 years....
Moreover, the franchise agreement called for the personal services of Simmons as the owner-operator. It provided for termination of the agreement in the event of his withdrawal or resignation and in case of sale without GM's prior approval. N.J.S.A. 56:10-5 prevents the cancellation or nonrenewal of a franchise without good cause except for voluntary abandonment by the franchisee. It further provides:
It shall be a violation of this act for a franchisor to terminate, cancel or fail to renew a franchise without good cause. For the purposes of this act, good cause for terminating, canceling, or failing to renew a franchise shall be limited to failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise.
Westfield Centre Service, Inc. v. Cities Service Oil Co., supra, holds that a franchisor must compensate a franchisee whose franchise is terminated in accordance with their agreement, even if the termination is in good faith for a bona fide business reason. There the court was dealing not with a breach of the franchisee's obligations under the agreement but with the franchisor's decision to sell a gasoline station for business reasons. The court said:
In summary, we hold that a franchisor who in good faith and for a bona fide reason terminates, cancels or fails to renew a franchise for any reason other than the franchisee's substantial breach of its obligations has violated N.J.S.A. 56:10-5 and is liable to the franchisee for the loss occasioned thereby, namely, the reasonable value of the business less the amount realizable on liquidation. These are the damages contemplated by N.J.S.A. 56:10-10, permanent injunctive relief not being appropriate. [at 469.]
*540 Simmons' rights are not at issue in the case. GM did not put Simmons in jeopardy. The bank's threat to foreclose Simmons and his own inability to meet his debts created Simmons' problems. Whatever rights Simmons may have had to transfer the franchise were subject to N.J.S.A. 56:10-6, which prevents a transfer without prior notice to the franchisor. This section of the act provides that a franchisor who is put on notice of a proposed transfer must approve or disapprove the "proposed transferee" within 60 days after receipt of such notice.
Both Simmons as franchisee and Perretti as the proposed transferee were in violation of the provisions of N.J.S.A. 56:10-6, Simmons for making the transfer and Perretti for accepting the transfer without prior notice to GM. Perretti compounded the violation by attempting to conceal it.
Even if we were to view the transaction with an eye toward protecting the franchisee's investment in the franchise, the right to approve the new owner must be considered a material, substantial term of the franchise agreement in this case. In keeping with the sense of the Franchise Practices Act we would hold a franchisor to the reasonable exercise of discretion in passing upon a proposed transferee. See also 15 U.S.C.A. § 1222 which imposes on automobile manufacturers a duty "to act in good faith." But the trial judge's holding that Simmons' failure to obtain GM's approval prior to the sale merely constitutes a "technical" breach cannot withstand scrutiny. Selecting the owner-operator of an automobile dealership can be extremely important from the viewpoint of a manufacturer. See Amerada Hess Corp. v. Quinn, 143 N.J. Super. 237, 251 (L.Div. 1976). Consider the repair obligations to satisfy the manufacturer's warranty, Ventura v. Ford Motor Corp., 180 N.J. Super. 45 (App.Div. 1979), and the impact of the strict liability tort doctrine in cases such as Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 407-408 (1960). An unacceptable franchisee can damage the public image as well as the pocketbook of a manufacturer. Thus, we conclude that the transfer to a purchaser who was *541 justifiably found unacceptable to the franchisor, as in this case, without prior notice to GM constituted a "substantial breach" of Simmons' obligations under its franchise agreement. Accordingly, termination of the franchise was authorized by the act, N.J.S.A. 56:10-5 and 6. Cf. Golden Gate Accept. Corp. v. General Motors Corp., 597 F.2d 676, 679 (9 Cir.1979); Community Chevrolet, Inc. v. General Motors Corp., 248 F. Supp. 390, 395 (D.Mass. 1965); General Motors Corp. v. Mac Co., 247 F. Supp. 723, 727 (D.Colo. 1965). N.J.S.A. 56:10-9 provides that substantial noncompliance by the franchisee with requirements imposed by the franchise agreement "shall be a defense for a franchisor, to any action brought under this act...."
Normally termination, even for a substantial breach of the franchise agreement, requires 60 days' notice, unless the franchise has been abandoned, in which case 15 days' notice will suffice. N.J.S.A. 56:10-5. However, the Act prohibits any transfer without prior notice to the franchisor. We need not determine whether 15 days' notice will suffice in this case for various reasons. The cancellation actually became effective more than 60 days after the transfer which was concealed from GM. Perretti did not acquire an interest in compliance with the Act, and, in any event, the continued restraints have given Perretti far longer than 60 days in which to wind up the affairs of the Oldsmobile dealership.

II
The trial judge found that GM treated Perretti unfairly in terms of the procedure employed in considering his application. This view was not extracted from any provision in the Franchise Practices Act. Assuming, however, that the trial judge was applying principles of equitable estoppel, we find his conclusions inappropriate. For one thing, GM did not deliberately mislead Simmons or Perretti. The misleading conduct and misrepresentations came from Perretti. GM had the right to proceed cautiously, since franchisors are not favored by the act. *542 See Westfield Centre Service, Inc. v. Cities Service Oil Co., supra. Moreover, Perretti's change in position came before GM had the opportunity to act. By February 28, 1979 Perretti had unconditionally undertaken various obligations in acquiring Simmons Olds and the corresponding real estate. Of course, the risk may have been worth it to Perretti, for he acquired a Toyota dealership and valuable real estate. But Perretti did not change his position for the worse because of GM's delay in rejecting him as a proposed transferee. If anything, the delay in cancellation of the franchise has enabled Perretti to recoup some of his investment. Indeed, Perretti had done all he could to prolong GM's decision. Perretti accepted the risk of nonapproval. GM's conduct did not induce his change in position which might have given rise to an equitable estoppel claim. See Highway Trailer Co. v. Donna Motor Lines, Inc., 46 N.J. 442, 449 (1966), cert. den., 385 U.S. 834, 87 S.Ct. 77, 17 L.Ed.2d 68 (1966). Here, too, we see no duty owed by GM to Perretti. The duty to give "material reasons" for the rejection of a transferee is owed to the franchisee, N.J.S.A. 56:10-6; it depends on the franchisee giving proper notice to the franchisor before the transfer.[5] In any case, we find no basis in fact for the trial judge's view that Perretti was denied procedural fairness. The trial judge's reliance *543 on Garrow v. Elizabeth Gen'l Hosp. and Dispensary, 79 N.J. 549 (1979), was misplaced.
Lastly, we reject the view taken by the trial judge that Simmons Olds, as franchisee, has rights that can be enforced by Perretti as the purchaser of its controlling shares of stock. The act is concerned with the sale of a franchise or any interest therein. N.J.S.A. 56:10-3(e). It prohibits transfers of a franchise, "or any interest therein," without prior written notice to a franchisor. N.J.S.A. 56:10-6. Restrictions on the transfer of securities of a franchisee are prohibited unless the transfer would have the effect of selling the franchise. N.J.S.A. 56:10-7(d). Thus, Perretti cannot control Simmons Olds so as to claim rights of a franchisee when the shares were transferred in violation of the act. The trial judge recognized that the sale from Simmons to Perretti was not conditioned on GM's approval and, therefore, Simmons' right to payment of the selling price did not depend on judicial enforcement of Perretti's claim as a franchisee. Instead, the trial judge tried to view the franchisee's rights as inhering in the corporation, Simmons Olds, since he was not enforcing Simmons' rights and was unwilling to declare Perretti the proper recipient of the franchise. In attempting to "do equity," the trial judge viewed Simmons Olds as an entity apart from the person who controlled its stock. For purposes of the act, however, the corporation in this case must be viewed as an extension of either Simmons or Perretti. They were the owner and proposed transferee of the franchise rights. The corporation was merely the instrumentality for exercising those rights. Cf. the Westfield Centre Service, Inc., case, supra, where the court considered the owner's investment in the enterprise when his wholly-owned corporation apparently held the franchise. In the case at hand we are concerned with the rights of Simmons and Perretti as transferor and transferee of the corporation's stock, not in independent rights of the corporation.
We conclude, therefore, that the trial judge erred in prohibiting GM's cancellation of the franchise for a substantial *544 breach of the franchise agreement and a transfer of ownership in violation of the act. This conclusion makes it unnecessary to consider GM's contention that the resale by Perretti was to be permitted by the court below on improper terms, namely, with Perretti retaining a substantial financial interest in the franchise in the form of a purchase money mortgage.
We reverse the judgment below insofar as it gave Perretti the right to continue operating as an Oldsmobile dealer and the right to transfer the franchise. GM shall have the right to discontinue relations with Simmons Olds as an Oldsmobile dealer 30 days from the date hereof. This period is allowed to afford Perretti sufficient time to seek a stay in the Supreme Court and to prepare for the closing of the Oldsmobile dealership. We understand that GM has procedures for winding up affairs with a dealer that include delivery of cars ordered by consumers and disposing of dealership inventory. If there are further problems in implementing the dealership termination the trial court shall have jurisdiction to deal with them consistent with this opinion.
Reversed and remanded to the court below in the event further proceedings are necessary. We do not retain jurisdiction.
NOTES
[1] The notice of appeal was filed on December 6, 1979. GM's motion to accelerate filed on December 21, 1979 was denied. On February 11, 1980 we also denied respondent's motion to file a cross-appeal nunc pro tunc. GM's motion for emergent relief was thereafter denied by Part D in May 1980.

Although not the subject matter of the appeal before us, we note that there were further proceedings in the trial court following entry of the final judgment in this case. Those proceedings, accompanied by a separate action more recently filed in the Chancery Division entitled Venturi v. General Motors Corp., resulted in an extension of the restraints against GM's termination of the dealership pending determination of Perretti's right to compel GM to accept Venturi as Perretti's transferee. On GM's application, Part I of this court on July 11, 1980 and July 16, 1980, after oral argument, vacated the trial court's restraints against GM stating that the record demonstrated that Perretti had not made good faith efforts "to make an arms length bona fide complete divestiture of his interests in the General Motors dealership" and "did not come into court with `clean hands' and thus was not entitled to further equitable relief." A continued stay until July 28, 1980 entered as part of that order to permit Perretti to seek relief in the Supreme Court was followed by an order issued in the Supreme Court granting leave to appeal and summarily vacating the prior two July 1980 orders of this court as well as accelerating this appeal and the Venturi action in the trial court. 85 N.J. 135.
Subsequently, while this appeal was awaiting oral argument, further proceedings in the trial court resulted in judgments terminating Perretti's rights in the dealership and dismissing Venturi's action, presumably because Venturi's rights derived from and were dependent upon Perretti's rights against GM. Separate appeals from those judgments have been filed in this court. A stay of execution of that judgment pending disposition of this appeal was entered by a single judge of this court, consistent with the stay granted by the Supreme Court.
[2] According to a letter signed by Rehill, a vice-president of the Trust Company of New Jersey, Perretti and his Chrysler Motors dealership had been doing business with the bank since June 1976. Simmons testified that when he called Rehill to advise him of the negotiations with Perretti, Rehill stated that any dealer with whom Simmons came to an agreement was acceptable, "as long as it's a dealer with this bank." Simmons testified that on more than one occasion he felt that the bank was in a conspiracy against him. There was testimony that he informed Lahti in January 1979 that he was having difficulty getting new financing because the bank had given him a bad report. Simmons had stated that he felt the bank was trying to force him out of business so that the bank's friends could take over his Oldsmobile and Toyota franchises. Indeed, Simmons testified that Toyota's regional manager, Davies, had told him that, when he was at a concert with Rehill, Rehill asked Davies for his cooperation because Rehill had some people that wanted the Simmons agency. We draw no conclusions from this evidence as it apparently played no role in the decision below.
[3] Bell testified in a deposition that he managed the Simmons Oldsmobile-Toyota agency since they "first got involved in the deal," despite the fact that he had previously pleaded guilty to embezzling $25,000 from a Perretti-owned dealership.
[4] We previously noted that Perretti's application had been returned to him on March 22.
[5] N.J.S.A. 56:10-6 provides in full:

It shall be a violation of this act for any franchisee to transfer, assign or sell a franchise or interest therein to another person unless the franchisee shall first notify the franchisor of such intention by written notice setting forth in the notice of intent the prospective transferee's name, address, statement of financial qualification and business experience during the previous 5 years. The franchisor shall within 60 days after receipt of such notice either approve in writing to the franchisee such sale to proposed transferee or by written notice advise the franchisee of the unacceptability of the proposed transferee setting forth material reasons relating to the character, financial ability or business experience of the proposed transferee. If the franchisor does not reply within the specified 60 days, his approval is deemed granted. No such transfer, assignment or sale hereunder shall be valid unless the transferee agrees in writing to comply with all the requirements of the franchise then in effect.