248 N.J. Super. 654 (1991)
591 A.2d 1024
LAWRENCE F. TYNAN, L.T. CHEVROLET & OLDS, INC., AND TOWNE CHEVROLET, INC., PLAINTIFFS-APPELLANTS,
v.
GENERAL MOTORS CORPORATION, DEFENDANT-RESPONDENT, AND J & B CHEVROLET AND OLDS, INC., AND R.W. EMERICK, JR. AND FOUR (4) JOHN DOES, BEING THE FICTITIOUS NAMES OF EMPLOYEES AND AGENTS OF GENERAL MOTORS CORPORATION AND ITS DIVISIONS, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued February 21, 1991.
Decided June 12, 1991.
*656 Before Judges KING, R.S. COHEN and STERN.
S.M. Chris Franzblau argued the cause for appellants (Greenberg Margolis, attorneys; Kenneth K. Lehn and S.M. Chris Franzblau, on the brief).
Michael S. Waters argued the cause for respondent (Carpenter, Bennett & Morrissey, attorneys; Michael S. Waters and John P. Dwyer, of counsel; Stephen F. Payerle, on the brief).
Wilentz, Goldman & Spitzer, submitted a brief on behalf of amicus curiae New Jersey Automobile Dealers Association (Marvin J. Brauth, of counsel and on the brief; Kenneth M. Denti, on the brief).
The opinion of the court was delivered by STERN, J.A.D.
The principal issue on this appeal is whether a contract purchaser of an existing automobile franchise is a "franchisee" entitled to the protection of the New Jersey Franchise Practices Act, N.J.S.A. 56:10-1 to -15 (the Act). In granting summary judgment for defendants, Judge Russell answered in the negative. She concluded that plaintiff, Laurence Tynan (Tynan), was not a "franchisee" within the meaning of N.J.S.A. 56:10-3d and that to obtain the Act's protection one must be "offered or granted" a "franchise" by the "franchisor." We agree and affirm the judgment.

I.
Plaintiff Tynan was the "sole owner" or the "principal shareholder" of plaintiff Towne Chevrolet, a former General Motors (GM) franchisee which had "sold all of its assets" in July, 1985. As "dealer operator" and "dealer owner" of Towne, Tynan had been active in dealer organizations throughout the period that *657 Towne remained an active dealership. In December 1985, Tynan entered into a conditional agreement with another GM franchisee, J & B Chevrolet and Olds, Inc. (J & B), to purchase that dealership. Plaintiff L.T. Chevrolet and Olds, Inc. was formed by Tynan to acquire the assets of J & B. The sale was contingent upon GM's issuance and execution of a "Dealer Sales and Service" or franchise agreement with Tynan. GM refused the franchise proposal offered by Tynan, citing its past relationship with him as the ground for its refusal. Tynan thereafter commenced this suit alleging violations of the Franchise Practices Act and various constitutional and common law grounds for relief. Judge Russell ultimately dismissed the entire complaint. She concluded that Tynan had no standing under the Act and that the complaint otherwise failed to state a claim for relief.
The counts alleging violations of the Franchise Practices Act are based on two separate theories. The first is premised on GM's refusal to consent to the transfer of the J & B franchise. The second is premised on GM's failure to reimburse Tynan for motor vehicle parts supplied under warranty by his former dealership, Towne Chevrolet. Under this second theory, Tynan seeks reimbursement for the parts previously supplied.

A.
Tynan was a district manager for the Chevrolet Division of GM in the 1950s and 1960s. He subsequently left GM and in 1969 became owner and president of Towne Chevrolet in Middletown, which, as we noted, was a GM franchised dealership. From 1970 to July 1985, plaintiff's dealership "ranked in the top group for his area in terms of volume and customer satisfaction." Tynan sold the dealership to a third party in July 1985. On July 14, 1985, Tynan wrote to defendant R.W. Emerick, the Chevrolet Zone Manager, that he had resigned as "Dealer/Operator of Towne ... and therefore, terminate my Dealer Sales and Service Agreement for Chevrolet Motor Vehicles."
*658 While Tynan owned Towne, he became an active member in the Chevrolet National Dealer Council (CNDC) on the local, regional and national levels. However, Tynan and other member dealers, who became dissatisfied with the representation they were receiving from CNDC, formed a new dealer association called the National Chevrolet Dealer Alliance (NCDA). Tynan ultimately became president of NCDA and actively advanced the interests of its member dealers. During his tenure as president of NCDA, Tynan was vocal in protesting GM policies and acts that he and other dealers believed were contrary to the dealers' economic interests. Upon the sale of Towne, however, Tynan no longer had any interest in any GM franchise.
On December 4, 1985, Tynan entered into an agreement to purchase the J & B franchise. The agreement was contingent upon Tynan entering into a "dealer/seller" agreement with GM. In other words, GM's consent to the franchise purchase was expressly required.[1] To perfect the purchase, Tynan formed L.T. Chevrolet & Olds, Inc., which was to become the franchisee under the contingent agreement with J & B.
Under N.J.S.A. 56:10-6, a franchise cannot be sold or transferred without notice to the franchisor. Within 60 days of the notice, the franchisor must provide written notice to the existing franchisee if the proposed transferee is unacceptable. In so doing, the franchisor must set "forth material reasons relating to the character, financial ability or business experience of the proposed transferee." N.J.S.A. 56:10-6.
In January, 1986, Tynan made a proposal and thereafter a revised proposal to become the "dealer operator" of the J & B dealership. These proposals were submitted to GM.
By letter dated March 21, 1986 to J & B, GM advised J & B, with a copy to Tynan, that its consent to the franchise transfer *659 was disapproved. GM expressly stated that Tynan was not an acceptable transferee of a GM dealership. The reason was expressly based on GM's prior relationship with Tynan. The letter stated:
... After receiving and reviewing his complete proposal on January 21, 1986, Chevrolet also reviewed its prior experience with My. Tynan in Middletown. It was clearly a mutually unsatisfactory experience. During the period, Mr. Tynan incessantly expressed extreme dissatisfaction with Chevrolet and General Motors policies, personnel, products, strategies or anything else related to our business relationship. My Tynan's thoughts were expressed by letter and orally with all levels of General Motors Corporation and Chevrolet Motor Division Management. Frankly, his business relationship with Chevrolet was not one which Chevrolet has any interest in renewing. Based on his apparently unsatisfactory relationship with Chevrolet, we would expect his assessment would be the same.
Article 2.1 of the General Motors Corporation Dealer Sales and Service Agreement Additional Provisions Booklet and Paragraph THIRD of the General Motors Corporation Dealer Sales and Service Agreement provide that the Dealer Agreement is entered into in reliance upon the qualifications of the person named as dealer operator. It is clear that the mutual respect and confidence necessary to reach a mutually satisfactory business relationship between Mr. Tynan and Chevrolet was not achieved during his tenure at Middletown. We therefore believe it is not in the best interest of Chevrolet, General Motors, or the consuming public to enter a Dealer Agreement with any company in which Mr. Tynan would exercise management or ownership. Therefore, we must decline your request that Mr. Tynan be named as dealer operator at Belvidere, New Jersey.
J & B, which the parties agree had standing to sue GM under the Act, did not challenge GM's decision. Rather, J & B exercised its right to terminate the agreement with Tynan and sold its business to a third party whom GM accepted as a franchisee.[2]
Judge Russell found that since "Tynan [was] not a [GM] franchisee" on January 21, 1986, having sold the Towne franchise, he had no standing under the Act to challenge GM's decision. She subsequently determined that as the allegations *660 regarding the tortious interference was based on violations of the Act, that claim had to be dismissed as well. The judge further found that a corporation cannot conspire with itself, could not enter a conspiracy where the corporation and its employees acted within the scope of their authority, and, in any event, did not conspire to commit a wrong.

B.
Tynan and Towne Chevrolet further alleged that between June 1, 1977 and July 1, 1985 Towne Chevrolet, while still operated by Tynan, supplied parts to retail customers pursuant to GM warranties. Tynan alleged that GM failed to reimburse Towne for those parts at the "prevailing retail price" as required under N.J.S.A. 56:10-15 and owed the dealership $178,587 for warranty parts reimbursement. At the time of the sale of its assets in 1985, Towne assigned the warranty claim to Tynan as "sole owner" of Towne. Judge Russell also dismissed this claim, as it was not asserted within the time period required. The judge wrote: "Where the basis for potential jurisdiction under the [Act] had already been voluntarily allowed by plaintiff to lapse, subsequent conduct by defendant General Motors cannot be construed to be the cause of lack of jurisdiction." (emphasis in original).

II.
Plaintiff Tynan contends that he had standing to sue GM under the Franchise Practices Act. The judge ruled that Tynan, as a rejected prospective transferee, could not assert the statutory cause of action created in favor of "franchisees". In essence, the judge determined that Tynan was not a "franchisee" protected by the Act. We agree.
The Act "define[s] the relationship and responsibilities of franchisors and franchisees in connection with franchise arrangements" in this State. N.J.S.A. 56:10-2. Under the Act a *661 "franchisee" is "a person to whom a franchise is offered or granted." N.J.S.A. 56:10-3d (emphasis added).
With respect to transfers of a franchise, the Act provides:
It shall be a violation of this act for any franchisee to transfer, assign or sell a franchise or interest therein to another person unless the franchisee shall first notify the franchisor of such intention by written notice setting forth in the notice of intent the prospective transferee's name, address, statement of financial qualification and business experience during the previous 5 years. The franchisor shall within 60 days after receipt of such notice either approve in writing to the franchisee such sale to proposed transferee or by written notice advise the franchisee of the unacceptability of the proposed transferee setting forth material reasons relating to the character, financial ability or business experience of the proposed transferee. If the franchisor does not reply within the specified 60 days, his approval is deemed granted. No such transfer, assignment or sale hereunder shall be valid unless the transferee agrees in writing to comply with all the requirements of the franchise then in effect. [N.J.S.A. 56:10-6].[3]
The Act further provides that:
Any franchisee may bring an action against its franchisor for violation of this act in the Superior Court of the State of New Jersey to recover damages sustained by reason of any violation of this act and, where appropriate, shall be entitled to injunctive relief. Such franchisee, if successful, shall also be entitled to the costs of the action including but not limited to reasonable attorney's fees. [N.J.S.A. 56:10-10].
Tynan argues that as a contract purchaser of a "franchise" he is entitled to the protections of a "franchisee". He argues that the Legislature intended to protect the persons who would suffer from the arbitrary conduct of franchisors with respect to the transfer of a franchise. There is some appeal to his contention because only the transferor and transferee can be hurt by the wrongful denial of consent.
GM maintains, however, that only a "franchisor" can "offer" a "franchise" and therefore plaintiff was not a "franchisee" with respect to the J & B transaction. GM points to N.J.S.A. 56:10-6 which distinguishes between a franchisee and a "proposed transferee" or "prospective transferee". According to *662 GM, a purchaser does not become a "franchisee" within the meaning of the Act until "offered" a franchise by the franchisor. See also N.J.S.A. 56:10-7a.
Judge Russell found that, "given the ordinary and well-understood implication" of the word "offer," "only one with the ownership rights to a franchise can `offer' it to a third party." Hence, she concluded that plaintiff was not a "franchisee" within the definition of N.J.S.A. 56:10-3d. She cited the language in N.J.S.A. 56:10-6 to support the position that a "franchisee" is in a different class from a "prospective transferee." The judge further reasoned that entertainment of suits by prospective purchasers would be contrary to the purpose of the legislation, which is to protect the public welfare by defining the relationship and responsibilities between franchisors and franchisees, not hopeful third parties. She also suggested that a franchisee should not be required to litigate with the franchisor over the lack of consent to transfer and noted that the Act allows a franchisee to elect between litigation and the less burdensome transfer to a third party acceptable to the franchisor.
In Simmons v. General Motors Corp., 180 N.J. Super. 522, 435 A.2d 1167 (App.Div. 1981), certif. den. 88 N.J. 498, 443 A.2d 712 (1981), we held that "the transfer [of a GM franchise] to a purchaser who was justifiably found unacceptable to the franchisor ... without prior notice to GM constituted a `substantial breach' of [plaintiffs'] obligation under its franchise agreement." Id. at 540-541, 435 A.2d 1167. When GM was eventually notified of the transfer, it rejected the transferee because he "held five Chrysler franchises and had a `bad reputation'." Id. at 525, 435 A.2d 1167. We sustained the action of GM in cancelling the franchise, id. at 543, 435 A.2d 1167, notwithstanding the transferee's third-party complaint alleging that GM had interfered with his "present and prospective economic advantage." Id. at 527, 435 A.2d 1167. In Simmons, Judge Botter noted that there was "no duty owed by GM to [the purchaser]. The duty to give `material reasons' for the rejection *663 of a transferee is owed to the franchisee, N.J.S.A. 56:10-6; it depends on the franchisee giving proper notice to the franchisor before the transfer." Id. at 542, 435 A.2d 1167, footnote omitted. We further concluded that there could be no transfer of "any interest" in the franchise without prior notice to GM and that, therefore, the purchasers of the controlling shares of stock in the franchisee "cannot control [the franchise] so as to claim rights of a franchisee when the shares were transferred in violation of the act." 180 N.J. Super. at 543, 435 A.2d 1167. In light of Simmons, we clearly have declined to treat a prospective or actual transferee of a franchise as a "franchisee" before the "franchisor" approves the transfer. Other courts have similarly concluded that the contract purchaser of a franchise has no standing to assert the rights of a franchisee under statutes similar to our Act.[4]
In Beard Motors v. Toyota Motor Distributors, Inc., 395 Mass. 428, 480 N.E.2d 303 (1985), plaintiff, a franchised Chevrolet dealership, entered into an agreement to "purchase all the assets" of a Toyota dealership in exchange for "assign[ment]" of the Toyota franchise to the plaintiff. The agreement was "expressly conditioned on [the Toyota dealer] obtaining the consent of Toyota Motor Distributors ... to the assignment of the franchise." 480 N.E.2d at 304. The transfer was ultimately disapproved, the sale did not take place, and plaintiff commenced an action under a Massachusetts statute which provided that there could be no assignment of a franchise without consent, but that "consent will not unreasonably be withheld." Id.
On certification of the question to the Supreme Judicial Court of Massachusetts, defendant Distributors' challenge to plaintiff's standing was sustained. The court held "that a prospective purchaser of a motor vehicle dealership does not have *664 standing under [the statute] to bring an action against a motor vehicle distributor who unreasonably withholds consent to the transfer of the prospective seller's franchise in violation of [the act]." 480 N.E.2d at 304.
The court concluded:
Unless the Legislature has clearly indicated that it intends a broader grant of standing, [citation omitted], we have generally looked to whether the party claiming to have standing has alleged an injury "within the area of concern of the statute or regulatory scheme under which the injurious action has occurred." [Citations omitted.] An analysis of the provisions of G.L.c. 93B and of the Legislature's apparent objectives enacting the statute leads to the conclusion that [plaintiff] has not alleged injury within the area of concern of the statute.
General Laws c. 93B was enacted in recognition of the potentially oppressive power of automobile manufacturers and distributors in relation to their affiliated dealers.... "[The act] was a response to long-recognized problems including that of the coercion of dealers by automobile manufacturers through such means as the cutting off or purposeful manipulation of the supply of cars." [citation omitted].
* * * * * * * *
It is clear from a reading of G.L.c. 93B as a whole that the intention of the Legislature was to protect motor vehicle franchisees and dealers from the type of injury to which they had been susceptible by virtue of the inequality of their bargaining power and that of their affiliated manufacturers and distributors. The injuries alleged by [plaintiff]  primarily the loss of anticipated profits from the sale of Toyotas and from capital appreciation in the value of the Toyota dealership, due to its inability to obtain the Toyota franchise  are not injuries within the area of legislative concern that resulted in the enactment of G.L.c. 93B, § 4(3)(i). [Plaintiff,] therefore, does not have standing under [the act.] [Id., 480 N.E.2d at 306-307].
Thus, the court concluded that the Massachusetts statute, similar to ours, was designed to protect franchisees and dealers from the type of damage to which they had been susceptible due to the inequality of their bargaining position. As in Beard, the case before us does not involve that type of inequality or concern.
In Knauz v. Toyota Motor Sales, U.S.A., Inc., 720 F. Supp. 1327 (N.D.Ill. 1989), a prospective Lexus dealer was held not to have standing under the Illinois Motor Vehicle Franchise Act, section 4(k) which defines "franchisee" as "a motor vehicle dealer to whom a franchise is offered or granted." Id. at 1329. *665 According to the Federal District Court, the statutory definition of "franchise" applied only to "an existing franchise relationship," id. at 1330[5], and did not include "a dealer who has applied for, but not been granted, a new franchise." Id. at 1330. Therefore, the plaintiff had no cause of action under this section. Id. at 1331.
Similarly, the Federal District Court for the District of Montana recently concluded that a contract purchaser of a Subaru dealership had no standing to assert a claim under the Montana Automobile Dealership Law against the regional Subaru distributor which withheld consent to transfer of the dealership. Statewide Rent-a-Car, Inc. v. Subaru of America, 704 F. Supp. 183 (D.Mont. 1988). The court found that the damages flowing from the lack of consent "do not fall within the area of legislative concern which resulted in enactment of Montana's Automobile Dealership Law and, therefore, plaintiffs lack standing to bring a claim pursuant to that statute." 704 F. Supp. at 185.
Cases relied upon by plaintiff in support of their contrary position either turn on controlling statutory language different from ours or on issues not relevant to our disposition. See e.g., the statutory provisions in Buckwalter Motors, Inc. v. General Motors Corp., 593 F. Supp. 628, 631 (S.D.Iowa 1984); S & T Motors v. General Motors, 203 Neb. 188, 277 N.W.2d 701, 704 (1979).
In Westfield Centre Serv. Inc. v. Cities Service Oil Co., 86 N.J. 453, 432 A.2d 48 (1981), our Supreme Court referred to the legislative statement which accompanied adoption of our Act:
New Jersey would ..., through the courts, ... rule out arbitrary and capricious cancellation of franchises while preserving the right of franchisors to safeguard their interests through the application of clear and nondiscriminatory *666 standards. The bill would protect the substantial investment  tangible and intangible  of both parties in the various franchises. It would rule out economic coercion as a business tactic in this most sensitive field.
The New Jersey Legislature has been asked many times in the past to deal on a piecemeal basis with various problems growing out of the franchise relationship. This bill would provide a comprehensive statutory formula for resolving a wide range of questions growing out of the franchise relationship. [Statement accompanying Assembly Bill 2063 (1971).]
[Westfield Centre, supra, 86 N.J. at 464, 432 A.2d 48].
In discussing the Act, Justice Schreiber wrote that the Act "regulates both the ongoing franchise relationship and its termination." Ibid. Based on the language of the Act and the Supreme Court's interpretation of its purpose, we conclude that the Legislature, like those of other states, did not intend the Act to protect a prospective transferee and, thus, that a contract purchaser is not a "franchisee" with standing to bring an action under the Act.[6]

III.
Plaintiffs further urge that, even if a contract purchaser is not a "franchisee," Tynan has standing under the Act as a third-party beneficiary. As N.J.S.A. 56:10-6 provides that a franchisor may reject a prospective transferee only upon providing the franchisee with "reasons relating to the character, financial ability or business experience of the proposed franchisee," Tynan asserts that the Legislature consciously intended to protect third parties who endeavor to purchase a franchise. Plaintiffs maintain that a franchisor could, contrary to the Legislature's intent, arbitrarily reject transferees, if the rule were otherwise. According to plaintiffs, a franchisor could wrongfully withhold consent to transfer if the contract purchaser *667 had no standing to sue and the existing franchisee lacked the resources or willpower to challenge the rejection. These policy arguments must be addressed to the Legislature, as we are satisfied that the present Act does not remedy plaintiffs' concerns. See Simmons v. General Motors, supra, 180 N.J. Super. at 543, 435 A.2d 1167. J & B, the franchise Tynan sought to acquire, asserts no direct claim against General Motors, and plaintiff cannot properly assert rights as a third-party beneficiary to that contract. Broadway Maintenance Corp. v. Rutgers, State Univ., 90 N.J. 253, 260, 447 A.2d 906 (1982).
In Don Rose Oil Co. Inc. v. Lindsley, 160 Cal. App.3d 752, 206 Cal. Rptr. 670 (Ct.App. 5th Dist. 1984), the California District Court of Appeals rejected a similar argument by a plaintiff claiming as the third party beneficiary of a franchise agreement. The court stated that the franchisor's "promise that it would not withhold its consent to a sale was made for the benefit of [the franchisee], rather than some third person" 160 Cal. App.3d at 758, 206 Cal. Rptr. at 673.
"The right of a third party beneficiary rests chiefly upon the fact that the contract will create reasonable expectations on his part and will induce him to change his position in reliance." 4 Corbin on Contracts, § 775 (West 1951). See also, Noller v. GMC Truck and Coach Div., General Motors Corp., 244 Kan. 612, 772 P.2d 271 (1989). We are presented with no agreement or contract which could reasonably give rise to such an expectation.[7]

IV.
Plaintiffs maintain that N.J.S.A. 56:10-6 sets forth the only grounds upon which GM can reject the proposed transfer and *668 that GM did not purport to reject Tynan for reasons authorized by that section. Plaintiffs further contend that there are numerous policy reasons for not permitting GM to reject a franchisee for the reasons given in GM's letter of March 21, 1986. There is much to be said for plaintiffs' contention that franchisees should not be discouraged from vocally criticizing their franchisors. But the Act protects "franchisees" in that endeavor, just as it would have protected Tynan had he elected to maintain the Towne franchise. See N.J.S.A. 56:10-7b. We must reject Tynan's present claim, however, because he is not a "franchisee" with standing to assert the claim.[8]

V.
In dismissing plaintiff's complaint, Judge Russell also found that plaintiffs had failed to state a claim upon which relief could be granted on non-statutory grounds. Plaintiffs contend, however, that they have alleged sufficient facts to withstand motions for judgment on the tortious interference and conspiracy claims. Amicus New Jersey Automobile Dealers Association joins in the former contention.[9]
We agree with Judge Russell that a corporation which acts through authorized agents and employees, as GM did here, cannot conspire with itself. See Exxon Corporation v. Wagner, 154 N.J. Super. 538, 545, 382 A.2d 45 (App.Div. 1977). Moreover, a conspiracy is not actionable absent an independent wrong. See Kurtz v. Oremland, 33 N.J. Super. 443, 456, 111 A.2d 100 (Ch.Div. 1954) (Haneman, J.S.C.), aff. o.b. 16 N.J. 454, 109 A.2d 286 (1954) ("A conspiracy cannot be made the subject *669 of a civil action unless something is done which without the conspiracy would give a right of action. The damage is the essence of the action, not the conspiracy."). Here, the actions of GM and its agents and employees produced no independent wrong. We so hold because we also agree with Judge Russell's disposition of the tortious interference claim.
The Supreme Court has recently set forth the elements of a claim for tortious interference in Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 751-753, 563 A.2d 31 (1989):
A complaint based on tortious interference must allege facts that show some protectable right  a prospective economic or contractual relationship. Although the right need not equate with that found in an enforceable contract, there must be allegations of fact giving rise to some "reasonable expectation of economic advantage." [Citation omitted.] A complaint must demonstrate that a plaintiff was in "pursuit" of business. Second, the complaint must allege facts claiming that the interference was done intentionally and with "malice." [Citations omitted.] ... [M]alice is defined to mean that the harm was inflicted intentionally and without justification or excuse. Rainer's Dairies v. Raritan Valley Farms, Inc., 19 N.J. 552, 563 (1955). [This is substantially similar to the Restatement (Second) of Torts definition, using the term "improper." Section 874A (1977).] Third, the complaint must allege facts leading to the conclusion that the interference caused the loss of the prospective gain. A plaintiff must show that "if there had been no interference[,] there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits." Leslie Blau Co. v. Alfieri, 157 N.J. Super. 173, 185-86 [384 A.2d 859] (App.Div.), certif. denied sub nom. Leslie Blau Co. v. Reitman, 77 N.J. 510 [391 A.2d 523] (1978). Fourth, the complaint must allege that the injury caused damage. [citation omitted].
* * * * * * * *
More significant is our determination that it is "fundamental to a cause of action for tortious interference with a prospective economic relationship that the claim be directed against defendants who are not parties to the relationship." [citations omitted.] Tortious interference developed under common law to protect parties to an existing or prospective contractual relationship from outside interference. [citations omitted.] However, the rule of tortious interference was not meant to upset the rules governing the contractual relationship itself. Where a person interferes with the performance of his or her own contract, the liability is governed by principals of contract law. [citations omitted.]
We will presume that GM's stated reasons for refusing to consent to the franchise transfer do not relate to Tynan's *670 "character" or "business experience", or any other reason authorized by the Act.[10] Based on this fact, and in the absence of a statutory remedy, Tynan suggests that he is entitled to relief under the common law.
We recognize that the statute does not expressly provide that all common law actions stemming from the improper withholding of consent to transfer are subsumed within or preempted by the Act. Nevertheless, we reject the contention that a common-law tort survives.
In Statewide Rent-a-Car, Inc. v. Subaru of America, supra, 704 F. Supp. at 185, plaintiff's tortious interference with contract claim against Subaru was also dismissed on defendant's motion. The court concluded that plaintiff "failed to establish ... that the refusal of performance was induced by the unlawful and malicious acts of the defendant," as defendant's refusal to approve plaintiff as a franchisee was not violative of the Montana Automobile Dealership Act. Id. at 186. The court also "concurr[ed] with defendant's assertion that [it was] allowed under the law to exercise its business judgment to protect its own financial interests free from liability under the tort of malicious interference with contract." Ibid. The court noted that "the franchise system becomes meaningless if franchisors lose the right to review potential franchisees and are forced to accept franchisees they did not choose." Ibid.[11]
While Statewide Rent-A-Car involved a claim for tortious interference with contract, not tortious interference with prospective economic advantage, the distinction is immaterial in this context. The law gives the franchisor the right to consent *671 to a transfer of the franchise, and any wrongful lack of consent can be challenged by the existing franchisee pursuant to the Act. In any event, Noller v. GMC Truck and Coach Div., supra, 244 Kan. 612, 772 P.2d 271, concluded that claims by a prospective franchisee for both tortious interference with contract and economic advantage must be dismissed. The court noted that "GMC had no duty to [the plaintiff] to grant him a franchise." 772 P.2d at 277. See also Morse v. Ted Cadillac, Inc., 146 A.D.2d 756, 537 N.Y.S.2d 239, 240 (App.Div. 1989), appeal dism'd 74 N.Y.2d 700, 543 N.Y.S.2d 388, 541 N.E.2d 417 (1989). ("General Motors did not wrongfully induce Ted Cadillac to breach its contract with [the prospective buyer of dealership].... Instead, General Motors simply exercised its right to refuse to enter into a dealership agreement with the plaintiff.")
General Motors has rights under both its franchise agreement and the Act. By exercising its own rights, GM cannot be said to have interfered with the rights of a third party. The fact that the Act limits the basis for denial of consent to a franchise transfer does not mean that a common-law cause of action must exist for the benefit of a person who lacks standing to enforce any statutory right. If the common law sufficiently protected a franchisee, no Franchise Practices Act would be required. And it can hardly be suggested that statutory rights adopted for the benefit of a franchisee can be the basis for a common-law suit on behalf of someone not protected by the Act.
The statute provides a remedy to a specific class of protected persons, existing "franchisees," and only to that class. The fact that others are unmentioned strongly suggests that the Legislature did not intend to grant them protection with respect to their prospective or contract interests in a franchise. Cf. Trustees of Local 478 and Allied Industries Pension Fund v. Pirozzi, 198 N.J. Super. 297, 313, 486 A.2d 1288 (Law Div. 1983), aff'd 198 N.J. Super. 318, 320-321, 486 A.2d 1299 (App. Div. 1984) (no civil counterpart to disorderly persons statute *672 which governed employer's misconduct, not employer's corporate officer individually). Compare, Meder v. Resorts Int'l Hotel, Inc., 240 N.J. Super. 470, 573 A.2d 922 (App.Div. 1989) certif. denied 121 N.J. 608, 583 A.2d 310 (1990) (violation of federal regulations supports tort action in New Jersey); Bortz v. Rammel, 151 N.J. Super. 312, 376 A.2d 1261 (App.Div.), certif. denied 75 N.J. 539, 384 A.2d 518 (1977) (cause of action based on statute and implementing regulations). Moreover, given the policy underlying the Act, as previously discussed, we can find no basis to authorize, as matter of judge-made law, a tort remedy for the benefit of a prospective franchisee who is not protected by the Act itself. See Comment d to 2 Restatement (Second) Torts 2d § 874A at 302-303 (1977).

VI.
Finally, Tynan and Towne challenge the dismissal of their warranty parts reimbursement claim. The claim was made pursuant to N.J.S.A. 56:10-15 for the period June 1, 1977 to July 1, 1985.
N.J.S.A. 56:10-15 provides in part that:
Reimbursement of franchisees by franchisors for services in satisfaction of warranty
If any motor vehicle franchise shall require or permit motor vehicle franchisees to perform services or provide parts in satisfaction of a warranty issued by the motor vehicle franchisor:
a. The motor vehicle franchisor shall reimburse each motor vehicle franchisee for such services as are supplied, in an amount equal to the prevailing retail price charged by such motor vehicle franchisee for such services and parts in circumstances where such services are rendered or such parts supplied other than pursuant to warranty; provided that such motor vehicle franchisee's prevailing retail price is not unreasonable when compared with that of the holders of motor vehicle franchises from the same motor vehicle franchisor for identical merchandise or services in the geographic area in which the motor vehicle franchisee is engaged in business.
* * * * * * * *
This section, like the remainder of the Act, is subject to N.J.S.A. 56:10-4. See Dunkin' Donuts of America, Inc. v. Middletown *673 Donut Corp., 100 N.J. 166, 177-178, 495 A.2d 66 (1985). That section provides:
56:10-4. Franchises to which act applicable
This act applies only to a franchise (1) the performance of which contemplates or requires the franchisee to establish or maintain a place of business within the State of New Jersey, (2) where gross sales of products or services between the franchisor and franchisee covered by such franchise shall have exceeded $35,000.00 for the 12 months next preceding the institution of suit pursuant to this act, and (3) where more than 20% of the franchisee's gross sales are intended to be or are derived from such franchise. (emphasis added).
We agree with plaintiffs' suggestion that a former "franchisee" must be able to enforce its rights under the Act. The fact that Tynan has no standing as a "franchisee" for purposes of the J & B transaction is of no relevance to his claim as "franchisee" with respect to his former franchise. He need not remain a "franchisee" to enforce those rights. He is entitled to a statutory remedy if forced out of business based on the franchisor's violations of his rights under the Act.
However, Judge Russell found that Tynan and Towne "rested on their rights to invoke the protection of the [Act] as to the warranty parts reimbursement until after the expiration of the time period affording a jurisdictional basis". She found that the 12 month period expired "at the very latest by December 30, 1985." However, it was not until March, 1986, after GM declined to permit Tynan to acquire the J & B dealership, that Tynan asserted the claim. Plaintiffs admit that Tynan sold and ceased operating Towne in July 1985 and did not sell GM products thereafter. The claim was not asserted within a 12 month period during which Towne's gross sales exceeded $35,000. This suit was not instituted until April 24, 1987 and was untimely. As Tynan and Towne sought a statutory remedy under N.J.S.A. 56:10-15, their complaint had to be filed within the time period permitted by N.J.S.A. 56:10-4(2). Dunkin' Donuts of America, Inc. v. Middletown Donut Corp., supra, 100 N.J. at 177-178, 495 A.2d 66 ("N.J.S.A. 56:10-4(2) provides that the Act applies only to those franchises under which gross sales of products or services between the franchisor and franchisee *674 shall have exceeded $35,000 for the twelve-month period preceding the institution of suit.")
As the warranty parts reimbursement claim was made exclusively under the Franchise Practices Act, we do not address the time limit in which a franchisee must commence any common law or other suit for breach of contract with respect to the warranty parts.

VII.
We find it unnecessary to address any other contention raised by plaintiffs on this appeal. R. 2:11-3(e)(1)(E). The judgment is in all respects affirmed.
COHEN, R.S., J.A.D. (Dissenting in part).
I concur with everything in the majority opinion except part VI, in which the court affirms the order dismissing, as untimely, Tynan's claim for reimbursement for parts supplied to customers in satisfaction of General Motors warranties. As to that part, I dissent.
The claim is expressly created by N.J.S.A. 56:10-15. Like every other franchisee's claim under the Act, it is subject to N.J.S.A. 56:10-4. That provision was intended to be a limitation on the kinds of franchises governed by the Act. The majority have turned it into a statute of limitations of capricious application.
Recall the structure of the Act. After a short-title provision, N.J.S.A. 56:10-1, and legislative findings, N.J.S.A. 56:10-2, the real business of the Act commences with a number of definitions, including franchise, franchisor and franchisee. N.J.S.A. 56:10-3. Then the Legislature goes on, in N.J.S.A. 56:10-4, to limit the application of the Act to franchises that meet three tests. The first is that there be a place of business in New Jersey. The third is that more than 20% of the franchisee's gross sales come, or are intended to come, from the franchise. The second test, the one involved here, is that

*675 gross sales of products or services between the franchisor and franchisee covered by such franchise shall have exceeded $35,000 for the 12 months next preceding the institution of suit pursuant to this act....
Since Tynan started his action for reimbursement for warranty parts more than 12 months after his former dealership went out of business, gross sales between GM and the dealership did not exceed $35,000 for the 12 months before suit. On that basis, the judge dismissed his warranty parts claim.
There is no legislative history to help. The words of the section seem plain enough. But the results of literal application are so unfair, and so capricious that the Legislature could not possibly have intended them. In those circumstances, we have the duty to look behind the words for their real meaning.
The Franchise Practices Act is remedial in purpose. It focuses on the need to protect franchisees from inequitable treatment by economically more powerful franchisors, and from their use of the ultimate weapon of termination of the franchise for any reason or no reason. See Westfield Centre Serv. Inc. v. Cities Serv. Oil Co., 86 N.J. 453, 464-465, 432 A.2d 48 (1981). Arbitrary termination is the central problem addressed by the Act, not only for its own evil, but also for the weapon it gives oppressive franchisors to control franchisees during the franchise relationship.
It is apparent from the structure of the Act and the words of N.J.S.A. 56:10-4 that the purpose was to restrict the application of the Act to franchises that were sufficiently local to merit regulation and sufficiently consequential to the franchisee to merit protection. A New Jersey place of business makes the franchise sufficiently local; the requirements of $35,000 in annual gross sales between the parties, and 20% of franchisee's sales to the public, make the franchise sufficiently consequential.
But, does the $35,000 test have to be satisfied during the 12 months next preceding the institution of suit? Since the test focuses on the size of the business to determine if it merits statutory protection, some period of time for measurement had *676 to be chosen. The size of the business during the most recent period is ordinarily the best measurement. That is, however, only if the business continues to exist. $35,000 in annual sales between franchisor and franchisee is not a very stringent standard. But no franchise that went out of business a year or so before starting suit could satisfy it if it is applied literally.
The Act has no statute of limitations readily identifiable as such. N.J.S.A. 56:10-4(2) does not read like one. Reading it to impose a limitations period yields incongruous results, especially as a part of an act whose purpose is to protect franchisees from arbitrary termination and consequent destruction of their businesses. A franchisee doing $35,001 in annual business has six years to sue its franchisor for a minor but illegal action which the franchisee can comfortably survive. N.J.S.A. 2A:14-1. But, if the majority is correct, a franchisee whose illegal treatment by the franchisor is so horrendously effective that it destroys the business altogether has only 12 months to sue. No purpose is served by giving less rights to the mortally wounded than to the barely scratched. No reason is suggested why the Legislature would want to burden the principal objects of legislative concern with a peculiarly worded statute of limitations of almost unique brevity,[1] and capricious application.
It is apparent that the $35,000 minimum was intended not to limit the time for suit but to measure the size of businesses protected by the Act. That intent can be effectuated. It requires only that the measurement of gross franchise business for the 12 months before suit be limited to ongoing franchises that are in business when suit is started. Businesses that have terminated before suit starts must have their gross sales calculated for the last 12 months they existed. Only in that way can *677 the legislatively undesigned limitations effect of a provision intended for another purpose be avoided.
The majority cites Dunkin' Donuts of America v. Middletown Donut Corp., 100 N.J. 166, 495 A.2d 66 (1985). That opinion cites the $35,000 threshold and notes that the franchisee did not meet it. There is not a hint in the opinion, however, that the failure to do so resulted from the passage of time since the franchisee closed its doors. Dunkin' Donuts is not authority for the result the majority reaches here.
NOTES
[1] Tynan could waive this condition of purchase but if GM did not consent L.T. would not have become an authorized franchisee.
[2] We are not asked to decide any issue with respect to J & B's conduct in not pursuing a cause of action against GM or an action on behalf of Tynan or L.T. We find it unnecessary to discuss the procedural history or case against the other defendants.
[3] It is uncontested that J & B complied with this section and GM gave a timely response. There is no procedural challenge to GM's decision raised before us.
[4] Each case must be analyzed under the wording of the given statute. New Jersey has not enacted the Uniform Franchise and Business Opportunities Act adopted by the Commissioners of Uniform State Laws.
[5] Significantly, the case also turned on the definition of "motor vehicle dealer." There is no specific claim before us under that part of our Act which deals specifically with "Motor Vehicle Franchises," N.J.S.A. 56:10-16 to 29. But see footnote 8, infra.
[6] We reject defendant's argument that 1977, 1982 and 1985 amendments to the Act, specifically relating to motor vehicle franchises, evidence that prospective transferees were meant to be protected in other relevant sections. See, respectively N.J.S.A. 56:10-13 to 10-15; N.J.S.A. 56:10-16 to 10-25; N.J.S.A. 56:10-26, et seq. These enactments addressed specific issues relating to franchisor-franchisee relationships and have no overall relevance to the issues before us.
[7] While we hold that the contract purchaser in this case does not have rights as a third party beneficiary, we do not directly pass on defendant's related contention that only the selling franchisee can decide to enforce its statutory rights because an independent action by the third party purchaser may delay the seller's ability to convey the franchise.
[8] In light of our holding, we do not have to decide if Tynan would be protected under the Act, with respect to the J & B transaction, if he still maintained the Towne franchise at the time.
[9] No issue is raised under the federal law. See 15 U.S.C.A. § 1225 (no preemption regarding automobile dealer suits against manufacturers, under 15 U.S.C.A. 1221-1225).
[10] In light of our holding, we need not actually decide if the stated reasons fall within the statutory requirement of N.J.S.A. 56:10-6.
[11] There is some support that the third party purchaser should be able to test the lack of consent, although it may be cloaked with a presumption of reasonableness. Don Rose Oil Co., supra, 160 Cal. App.3d. at 759, 206 Cal. Rptr. at 674.
[1] Only actions for defamation, some forfeitures, and claims to the beds of vacated streets have one-year statutes. N.J.S.A. 2A:14-3, -10, -11. Third-party claims for proceeds of attachment or execution must be brought with two months of notice. N.J.S.A. 2A:14-9.