**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-2283
_____

MALL CHEVROLET, INC.,
Appellant

v.

GENERAL MOTORS LLC
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 1-18-cv-15077)
District Judge:  Honorable John R. Padova
_____

Argued:  May 24, 2022

Before: BIBAS, MATEY, and PHIPPS, *Circuit Judges*.

(Filed: April 26, 2024)
_____

William M. Tambussi        **[ARGUED]**
Jonathan L. Triantos
BROWN & CONNERY, LLP
360 N Haddon Avenue
P.O. Box 539
Westmont, New Jersey 08108

Laura D. Ruccolo
CAPEHART SCATCHARD, P.A.
8000 Midlantic Drive
Laurel Corporate Center, Suite 300S
P.O. Box 5016
Mount Laurel, New Jersey 08054

       *Counsel for Mall Chevrolet, Inc.*

James C. McGrath   **[ARGUED]**
Michael A. Kippins
SEYFARTH SHAW LLP
Two Seaport Lane
Suite 1200, Seaport East
Boston, Massachusetts 02210

Jeremy A. Cohen
SEYFARTH SHAW LLP
620 Eighth Avenue, 32nd Floor
New York, New York 10018

       *Counsel for General Motors LLC*

————————————————

OPINION OF THE COURT

————————————————

PHIPPS, *Circuit Judge*.

A motor vehicle manufacturer sought to terminate its franchise agreement with one of the most successful car dealerships in New Jersey after discovering evidence that the

dealership had submitted false warranty claims for vehicle repairs. The manufacturer also announced its intention to recoup the amounts it paid in disputed warranty claims through a chargeback process. The dealership then preemptively sued the manufacturer under the New Jersey Franchise Practices Act to prevent the termination of the franchise agreement and the chargebacks. Neither of those claims nor any of the others brought by the dealership survived summary judgment.

Now on appeal, the dealership challenges the District Court's summary-judgment rulings. For the reasons below, there was no genuine dispute of material fact – the dealership did submit false claims for warranty repairs – and the manufacturer was entitled to judgment as a matter of law on each of the appealed claims. Accordingly, on *de novo* review, we will affirm the judgment of the District Court.

## I. FACTUAL BACKGROUND

### A. GM's Reliance on Dealerships and Its Contract with Mall Chevy

General Motors LLC, commonly abbreviated as 'GM,' manufactures and sells new motor vehicles. As part of its business model, GM relies on independently owned and operated authorized dealers to sell its brands of new motor vehicles directly to customers for personal or business use.

In 1986, GM entered into a franchise agreement for the sale and service of its motor vehicles with Mall Chevrolet, Inc., or 'Mall Chevy' for short. Under the 2015 version of the contract, Mall Chevy, whose dealership was physically located in Cherry Hill, New Jersey, was the 'dealer,' and its area of primary responsibility was the Camden region. That contract also included an assurance by Mall Chevy that one of its partial owners, Charles W. Foulke III – whom the contract designated as a 'dealer operator' – would "provide personal services by exercising full managerial authority" over the operations of the dealership. Dealer Sales and Service Agreement 2015,

3

Standard Provisions, Art. 2 (JA147). For years, Mall Chevy was one of GM's top-performing Chevy dealers regionally and nationally.

**B. Mall Chevy's Performance of Warranty Repairs for GM**

The franchise agreement obligated Mall Chevy to service vehicles, and that included warranty repairs on qualified vehicles. After performing warranty work, Mall Chevy could submit a reimbursement claim to GM for parts and a reasonable amount of labor. In the contract, Mall Chevy promised that its claims for payment would be "true and accurate." Dealer Sales and Service Agreement 2015, Standard Provisions, Art. 11.2 (JA159). As a matter of practice, GM allowed Mall Chevy to submit reimbursement claims for warranty work without supporting documentation.

Despite that flexibility, the contract established several internal controls. Mall Chevy had to maintain a uniform accounting system, and it had to retain for at least two years and make available upon GM's request the supporting documentation for a warranty repair. In addition, Mall Chevy agreed to allow GM "to access, examine, audit, and take copies of any of the [required] accounts and records." *Id.*, Art. 11.3 (JA159). And if, after an audit, GM could not verify a warranty repair, then it could recover the amounts paid for parts and labor through a chargeback. Most consequentially, if Mall Chevy submitted a false claim to generate a payment that would not otherwise be due, then GM could terminate the franchise agreement without affording Mall Chevy an opportunity to cure that breach.

One of the key supporting documents for service work, including warranty repairs, is a job card. A job card is supposed to have several pieces of information related to the service work requested and performed. That information includes the date of service, the vehicle identification number, the vehicle's odometer reading, the customer's name and

4

contact information, the details of a customer's concerns or complaints, and the customer's signature authorizing repairs (or a signature by a service manager along with an explanation for the absence of a customer's signature).

Some of that job-card information is available from other sources. For instance, when advertising used vehicles, some vendors, such as CarMax and Carvana, make available on their websites vehicle identification numbers and the corresponding mileage for vehicles in their inventory. With the names and contact information for those vendors available online, the other information on a job card – the detailed description of a customer's concerns and an authorized signature – is critical to a job card's integrity.

To perform service work, including warranty repairs, Mall Chevy employed service advisors, a dispatcher, and technicians. The service advisors had significant responsibility for preparing the job cards, including entering the information about the vehicle and the customer. The dispatcher was responsible for assigning the repair order to a technician, who would repair the vehicle and record the work done on the job card before returning the job card to the service advisor.

As part of their compensation from Mall Chevy, service advisors and the dispatcher received commissions on the amount of service work performed. The commission for service advisors was tied to the repair work performed on their job cards. The commission for the dispatcher was based on the overall volume of service work performed, excluding revenues attributed to the body shop. The calculation of those commissions included warranty repair work.

### C. Mall Chevy's Problematic Claims for Warranty Repairs

In May 2017, as part of a regional review, GM examined warranty reimbursement claims submitted by Mall Chevy. Through two letters – one dated May 16, the other May 19 –

5

GM informed Mall Chevy of the results of its review of the dealership's warranty-claim practices.

The May 16 letter was ominous. It articulated GM's suspicion that Mall Chevy was falsely claiming to have performed warranty work on what may be called 'ghost vehicles' – vehicles that were not actually repaired by Mall Chevy. Based on its finding that "a high number of Mall Chevrolet's warranty cases [were] being processed for used vehicle locations, resulting in legitimate questions as to the circumstances of these repairs," GM informed Mall Chevy that it would not pay warranty claims for cars owned by three used-car dealers – CarMax, Carvana, and DriveTime – without GM's prior approval. Letter from GM to Mall Chevy, May 16, 2017 (JA6569).

That message prompted an immediate response from one of Mall Chevy's service advisors, Ray Moffatt, whose compensation included a commission on warranty work. He resigned that day. In a text message to several of his Mall Chevy colleagues, Moffatt let them know that he quit and that Mall Chevy's general manager "knows everything, the truth." Screenshot of Moffatt Text Message (JA6616). Moffatt closed his text message with, "Sorry guys good while it lasted." *Id.*

The next letter, dated May 19, detailed GM's findings, and it carried additional consequences. GM identified warranty claims for over $98,000 that were invalid because the corresponding job cards lacked required information or an authorized signature. GM also found other problematic warranty claims totaling more than $16,000 related to out-of-warranty work, the use and retention of GM parts, improper repeat repairs, and work not performed. As a result of those findings, GM announced that it was charging back $114,178.60 in warranty payments. Mall Chevy did not challenge that chargeback.

6

In the three weeks following that letter, three employees in Mall Chevy's service department in addition to Moffatt ceased working there. One was the dispatcher, who, like Moffatt, received a commission based in part on the performance of warranty work. Also, the dispatcher along with one of the other employees were recipients of Moffatt's text message.

Even then, GM's diligence was not complete: on July 5, 2017, it announced that it would audit Mall Chevy. The audit examined an eleven-and-a-half-month period, from August 2, 2016, to July 14, 2017, and it involved on-site auditors as well as a review of the electronic claims that Mall Chevy had submitted.

As a result of the audit, GM prepared a 94-page Debit Deviation Report. That report, dated April 30, 2018, identified 517 deviations on job cards related to 346 vehicles (the job cards for some vehicles had multiple deviations associated with them). In total, GM had paid Mall Chevy $672,176.59 for that warranty work. That amount included claimed warranty work on ghost vehicles – 186 of the deviations involved 130 vehicles whose presence at the dealership was "not substantiated." Debit Deviation Report (JA4838–4932).

### D. GM's Notice of Termination of the Franchise and Its Intent to Chargeback Amounts Claimed for Warranty Repairs

Within days of completing the Debit Deviation Report, GM sent a notice-of-breach letter to Mall Chevy. That letter, dated May 3, 2018, relayed the findings of the audit by highlighting the 517 deviations. It also attached the Debit Deviation Report and identified four claims that were facially fraudulent based on the information Mall Chevy's employees had recorded on the job cards.[1] The letter then gave Mall Chevy thirty days to

---

[1] GM explained that those four claims were fraudulent because (i) one job card listed a mileage number greater than what was recorded on a later-submitted claim on the same car by a GM

submit additional documentation to clear the deviations or to provide "a detailed explanation, together with a comprehensive plan describing the precise steps that [Mall Chevy] will take to ensure that [it] will abide by all its obligations under [the contract]." Letter from GM to Mall Chevy, May 3, 2018 (JA190). Finally, the letter warned that if Mall Chevy did not timely respond with the requested information, then GM would chargeback the $672,176.59 in problematic warranty claims and would reserve the right to terminate the franchise.

Mall Chevy's May 31 response was not an act of contrition. The cover letter accused GM's auditors of "intentionally claiming issues that do not exist," and professed that "[t]here is no fraud or false claims involved here and GM presents no evidence of fraud." Response Letter from Mall Chevy to GM, May 31, 2018 (JA193). Mall Chevy included in its response nearly a thousand pages of documents, including some job cards, and it asserted that those documents addressed "each and every claimed deviation." *Id*. (JA192). But beyond that document dump, Mall Chevy offered no further explanation.

That correspondence did not convince GM – it still believed that Mall Chevy had submitted false claims for warranty repairs. On July 31, GM sent a notice-of-termination letter to Mall Chevy. The letter explained that, despite the volume of pages provided, Mall Chevy's response resolved only 12 of the 517 deviations on the Debit Deviation Report, totaling $16,143.55. And Mall Chevy's flat denials of the four examples of fraud were inadequate, according to GM. Citing to specific contractual obligations, GM informed Mall Chevy

---

dealership in Georgia; (ii) one job card omitted an odometer reading for which the technician's time report and time ticket did not reflect any work on the vehicle; (iii) one job card listed a technician code that did not belong to a Mall Chevy employee; and (iv) one job card reported a lower odometer reading for a vehicle than it had on the two prior occasions that it was serviced by Mall Chevy.

8

that its submission of false claims for warranty work constituted a material breach of the contract. With that explanation, the letter notified Mall Chevy of GM's intention to terminate the contract on October 1, 2018, and to chargeback the value of the remaining unexplained deviations – $656,033.

## II. PROCEDURAL HISTORY

### A. Mall Chevy's Initiation of This Lawsuit Against GM

On September 20, 2018, days before GM's announced effective date for termination and chargebacks, Mall Chevy filed a civil suit against GM in the Superior Court of New Jersey. Most of Mall Chevy's claims were brought under the right of action created by New Jersey's Franchise Practices Act for violating its protections. *See* N.J. Stat. § 56:10-10 ("Any franchisee may bring an action against its franchisor for violation of this act . . . to recover damages sustained by reason of any violation of this act and, where appropriate, shall be entitled to injunctive relief."). Mall Chevy first claimed that GM lacked the good cause required under the Act for terminating the franchise agreement, and it sought to permanently enjoin GM from relying on the grounds stated in the notice of termination to terminate the agreement (Count I). *See* N.J. Stat. § 56:10-5 (making it unlawful for a franchisor to terminate a franchise without good cause).[2] Mall Chevy also claimed that GM violated § 56:10-15(f) of the Act by seeking unsubstantiated chargebacks, and Mall Chevy sought to enjoin GM from finalizing the chargebacks identified in the notice of termination (Count V). In two of its other counts, Mall Chevy

[2] Mall Chevy's wrongful-termination claim triggered the automatic preliminary injunction provision of the Franchise Practices Act, which afforded Mall Chevy "all rights and privileges of a franchisee as if notice of termination had not been given" pending the final disposition of the action. N.J. Stat. § 56:10-30(a). GM does not contest the constitutionality of that provision.

alleged that GM imposed unreasonable performance standards on Mall Chevy in violation of § 56:10-7.4(a) of the Act (Count II) and that GM used an arbitrary and unreasonable process to gauge Mall Chevy's performance in violation of § 56:10-7.4(d) of the Act (Count III).[3] In addition to injunctive relief, Mall Chevy requested compensatory damages, punitive damages, a declaratory judgment, and attorney's fees and costs.

GM timely removed the case to the District Court on diversity grounds: the parties were completely diverse,[4] and the

---

[3] The other three counts – one under the statute and two common-law claims – are not subject to this appeal. The statutory claim was for failure to reimburse warranty services in violation of § 56:10-15(a) of the Act (Count IV), and the parties stipulated to its dismissal with prejudice. The two common-law claims were for breach of contract based on non-reimbursed warranty repairs (Count VI), and for breach of the implied covenant of good faith and fair dealing on several grounds, including by conducting bad-faith audits of Mall Chevy (Count VII). The District Court rejected those at summary judgment, and that portion of the ruling has not been appealed. *See Mall Chevrolet, Inc. v. Gen. Motors LLC*, 2021 WL 426193, at \*17 (D.N.J. Feb. 8, 2021).

[4] Mall Chevy is a citizen of New Jersey by its incorporation and its principal place of business – both of which are in New Jersey. GM, as a limited liability company, takes on the citizenship of its members and sub-members, *see Lincoln Benefit Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015), which renders it a citizen of Delaware and Michigan. Its sole member is General Motors Holdings LLC, whose sole member is General Motors Company, a Delaware corporation with its principal place of business in Michigan.

10

amount in controversy exceeded $75,000.[5]  *See* 28 U.S.C. § 1441; *id.* § 1332(a)(1).

### B. The Cross-Motions for Partial Summary Judgment

After over a year of discovery, the parties cross-moved for partial summary judgment.

Mall Chevy sought summary judgment on two of its statutory claims.  It argued that it should succeed on the wrongful-termination claim (Count I) because GM lacked good cause to terminate the franchise.  Mall Chevy also asserted that GM was not entitled to the proposed chargebacks because it did not establish that the claimed warranty repairs were fraudulent (Count V).

GM cross-moved for summary judgment on all remaining counts except for the claim that GM did not substantiate its intended chargebacks (Count V).  In response to the wrongful-termination claim (Count I), GM argued that it had good cause to terminate the franchise agreement because Mall Chevy had materially breached the agreement by submitting false claims for warranty work.  With respect to the other claims now on appeal (Counts II and III), GM argued that Mall Chevy did not produce any evidence of compensatory damages needed to

---

[5] The amount in controversy, which must exceed $75,000, is met here based on the value of the claimed chargebacks as well as the value of the terminated dealership, neither of which is to a "legal certainty" less than the jurisdictional amount. *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 202 (3d Cir. 2022) (quoting *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 395 (3d Cir. 2016)); *see also St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938) ("It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.").

sustain those claims, and that punitive damages were unavailable in the absence of compensatory damages.

In addition to its summary-judgment motion, GM moved to strike Mall Chevy's jury demand for the unsubstantiated-chargebacks claim (Count V). As argued by GM, because that claim sought equitable relief, it did not belong before a jury.

The District Court denied Mall Chevy's motions and granted GM's motions. *See Mall Chevrolet, Inc. v. Gen. Motors LLC*, 2021 WL 426193, at \*1 (D.N.J. Feb. 8, 2021). In rejecting Mall Chevy's wrongful-termination claim, the District Court determined that GM had good cause to terminate the franchise agreement because there was no genuine dispute that Mall Chevy had materially breached the contract by submitting false claims for warranty repairs. *See id.* at \*11–12. The District Court also denied Mall Chevy's remaining statutory and common-law claims unrelated to chargebacks because Mall Chevy did not make a showing of compensatory damages. *See id.* at \*17. Relying on that same rationale – the lack of compensatory damages – the District Court denied Mall Chevy's request for punitive damages. *See id.* Finally, the District Court granted GM's motion to strike Mall Chevy's demand for a jury trial because the remaining claim for unsubstantiated chargebacks sought only equitable relief. *See id.* at \*18–19.

Before a bench trial on Mall Chevy's unsubstantiated-chargebacks claim, GM sought and obtained leave to move for summary judgment on that count. In its motion, GM invoked the defense in § 56:10-9 of the Franchise Practices Act, which bars a franchisee from bringing a claim under the Act if the franchisee has failed to substantially comply with the franchise agreement. *See* N.J. Stat. § 56:10-9. Equipped with the § 56:10-9 defense, GM argued that Mall Chevy's material breach constituted a failure to substantially comply with the contract, such that Mall Chevy could not sustain its claim to enjoin allegedly unsubstantiated chargebacks. That argument,

too, persuaded the District Court, which then entered summary judgment in GM's favor. *See Mall Chevrolet, Inc. v. Gen. Motors LLC*, 2021 WL 2581665, at *5 (D.N.J. June 23, 2021).

### C. Mall Chevy's Appeal

Through a timely notice of appeal of the District Court's final decision, Mall Chevy invoked this Court's appellate jurisdiction. *See* 28 U.S.C. § 1291; Fed. R. App. P. 4(a)(1)(A). Mall Chevy now argues that the District Court erred in rejecting its four statutory claims.[6]

In opposing Mall Chevy's arguments, GM focuses on sustaining its proof that Mall Chevy materially breached the franchise agreement. Such a breach, GM contends, provides good cause to terminate the franchise agreement and constitutes a failure to substantially comply with the agreement for purposes of the § 56:10-9 defense.

---

[6] In addition to relying on the arguments that it presented to the District Court, Mall Chevy moved to certify three questions to the New Jersey Supreme Court. *See* N.J. Ct. R. 2:12A-1. That request was not waived or forfeited because it could not have been raised in the District Court. *See id.* (permitting certification only "if the answer may be determinative of an issue in litigation pending in the Third Circuit and there is no controlling appellate decision, constitutional provision, or statute in [New Jersey]"). Those questions all relate to the New Jersey Franchise Practices Act: (i) whether the actions of rogue employees that were unbeknownst to a dealer operator but that otherwise qualified as a material breach of contract constitute good cause under the statute to terminate a franchise; (ii) whether a franchisor may rely on after-acquired evidence to establish that it had good cause for terminating a franchise; and (iii) whether the statute's defense for failure to substantially comply with the terms of a franchise agreement applies to claims of unlawful chargebacks.

13

# III. Discussion

## A. Mall Chevy's Claim for Wrongful Termination of Its Dealership

Mall Chevy disputes the entry of summary judgment against its wrongful-termination claim count on three grounds. It contends that summary judgment was improper because there is a genuine dispute about whether GM had good cause for terminating the franchise agreement. Mall Chevy also argues that the Franchise Practices Act does not permit a franchisor to use after-acquired evidence to show good cause, which GM did. In addition, Mall Chevy denies that it was the franchisee and asserts that the real franchisee was the dealer operator, Foulke, who could not be deemed to materially breach the agreement based on the actions of Mall Chevy's rogue employees. Those challenges have no merit.

### 1. No Genuine Dispute of Material Fact Prevents Summary Judgment in Favor of GM on the Wrongful-Termination Claim.

#### a. GM Must Prove Good Cause for Terminating the Dealership.

In interpreting Rule 56, the Supreme Court has outlined two closely related methods for a movant to succeed at summary judgment. First, under the standard approach, the moving party may produce material facts, established as genuinely undisputed, that entitle it to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–52 (1986) (explaining the meaning of the terms 'material' and 'genuine'). Second, under the *Celotex* approach, a moving party may instead demonstrate that the nonmoving party has not made "a showing sufficient to establish the existence of an element essential to that party's

14

case . . . *on which that party will bear the burden of proof at trial.*" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (emphasis added).

In 2011, New Jersey supplemented the protections afforded to motor vehicle franchisees under the Franchise Practices Act, and one consequence of that legislation was that it foreclosed the *Celotex* method for motor vehicle franchisors seeking summary judgment on claims that they wrongfully terminated a franchise. *See* Act of May 4, 2011, ch. 66, § 12, 2011 N.J. Laws 496, 513 (codified at N.J. Stat. § 56:10-30(c)). By its terms, that enactment imposed the burden of proving good cause on the franchisor – even when the franchisor was a defendant:

> In any action or alternate dispute resolution proceeding with respect to the termination of a motor vehicle franchise, the motor vehicle franchisor shall have the burden of proving that termination of the motor vehicle franchise does not violate [§ 56:10-5].

N.J. Stat. § 56:10-30(c); *see also id.* § 56:10-5 (setting forth requirements for terminating a franchise, including the good-cause requirement); *cf. Addington v. Texas*, 441 U.S. 418, 423 (1979) (explaining that in "the typical civil case" the plaintiff, not the defendant, bears the burden of proof under a preponderance-of-the-evidence standard). Because the motor vehicle franchisee does not have the burden of proving wrongful termination, the franchisor cannot successfully move for summary judgment under the *Celotex* approach, which applies only when the non-moving party bears the burden of proof for an element of a claim at trial. *See Celotex Corp.*, 477 U.S. at 322.

Although the *Celotex* approach is not viable here, GM may still prevail under the standard method for summary judgment, but that requires establishing that the material facts are undisputed. A fact is material if its resolution "might affect the

15

outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 203 (3d Cir. 2022). And a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also SodexoMAGIC*, 24 F.4th at 203–04. To show that no material facts are genuinely disputed, GM, as the moving party, may rely on several sources, including deposition testimony, documents, electronically stored information, sworn statements, stipulations, admissions, and interrogatory answers. *See* Fed. R. Civ. P. 56(c)(1)(A). Even still, Mall Chevy, as the nonmoving party, may object to the consideration of any fact within those materials that "cannot be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2), and reasonable inferences from the facts are drawn in Mall Chevy's favor, *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

### b. The Submission of False Claims for Warranty Repairs Qualifies as Good Cause for Terminating the Franchise Agreement.

GM's entitlement to judgment as a matter of law on Mall Chevy's wrongful-termination claim depends on the Franchise Practices Act. *See Anderson*, 477 U.S. at 248 ("[T]he substantive law will identify which facts are material."). That statute defines "good cause" for terminating a franchise as the "failure by the franchisee to substantially comply" with the requirements of the franchise agreement. N.J. Stat. § 56:10-5. That good-cause standard is similar to the legal concept of material breach, i.e., a breach that discharges the non-breaching party's obligation to perform its future contractual obligations. *See Nolan v. Lee Ho*, 577 A.2d 143, 146 (N.J. 1990) ("When there is a breach of a material term of an agreement, the non-breaching party is relieved of its obligations under the agreement."); *see also* Restatement (Second) of Contracts § 237 (Am. L. Inst. 1981) ("[I]t is a condition of each party's remaining duties to render

16

performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time."). Consistent with that understanding, in interpreting the Franchise Practices Act, New Jersey courts have recognized that a franchisee's material breach of a franchise agreement constitutes good cause for termination of a franchise. *See Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp.*, 495 A.2d 66, 72–73 (N.J. 1985); *see also Gen. Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 317 n.8 (3d Cir. 2001) (explaining that there is "no real or practical difference between a conclusion that a party materially breached a contract, and a conclusion that the party failed to substantially comply with its obligations under a contract"). Thus, if Mall Chevy materially breached the franchise agreement, then as a matter of law, GM would have good cause to terminate the franchise.

To determine if a breach is material, rather than minor, New Jersey courts typically consider several factors. *See Roach v. BM Motoring, LLC*, 155 A.3d 985, 991 (N.J. 2017) ("To determine if a breach is material, we adopt the flexible criteria set forth in Section 241 of the *Restatement (Second) of Contracts* (1981).").[7] But if a contract identifies a term as 'material' or an act or omission as a 'material breach,' then New Jersey courts generally defer to the parties' agreement on the materiality of that term, act, or omission. *See Dunkin' Donuts*, 495 A.2d at 75 ("[B]ecause the franchise contracts are clear in making the underreporting of sales a material breach of contract, thereby entitling [the franchisor] to terminate the franchise and receive damages due, equity should and must respect these contractual provisions.").[8] And here, the

---

[7] *See also* Restatement (Second) of Contracts § 241 (proposing five factors for determining whether a breach is material).

[8] *See also In re Gen. DataComm Indus., Inc.*, 407 F.3d 616, 624 (3d Cir. 2005) (deferring to a contract's definition of material breach); 23 Richard A. Lord, *Williston on Contracts*

franchise agreement identifies several acts as material breaches, including the submission of false claims "which would not otherwise have qualified for payment." Dealer Sales and Service Agreement 2015, Standard Provisions, Art. 14.5.5 (JA165). Thus, if Mall Chevy submitted false claims for warranty repairs, then GM would have good cause as a matter of law to terminate the franchise agreement. *See Mall Chevy, Inc.*, 2021 WL 426193, at *9 n.7 (recognizing that there was no dispute "that the submission of such claims, if proven, would constitute a material breach"); *see also Dunkin' Donuts*, 495 A.2d at 71 (explaining that the Franchise Practices Act protects only innocent franchisees); *Amerada Hess Corp. v. Quinn*, 362 A.2d 1258, 1267 (N.J. Super. Ct. Law Div. 1976) ("[P]rotection of the public's welfare points toward termination of dishonest franchisees.").

### c. There Is No Genuine Dispute that Mall Chevy Submitted False Claims for Warranty Repairs on Ghost Vehicles.

GM produced an abundance of factual support for the conclusion that Mall Chevy submitted false claims for warranty work – at least for repairs on ghost vehicles. The foundational piece of evidence is the Debit Deviation Report. Even if not every one of the 517 discrepancies identified in that report constitutes a material breach, the submission of a claim for warranty work on a ghost vehicle, as a false claim, would

---

§ 63:3 (4th ed. 2018 & Supp. 2023) ("Where the contract itself is clear in making a certain event a material breach of that contract, a court must ordinarily respect that contractual provision."). *But cf. In re Weinstein Co. Holdings LLC*, 997 F.3d 497, 507–09 (3d Cir. 2021) (declining to interpret every term in a contract as material based on a nine-word phrase buried in a covenant provision, which did not provide for termination or any other remedy and was better viewed as a condition precedent to a payment obligation).

be a material breach of the franchise agreement. And the Debit Deviation Report identified 186 instances of "[v]ehicle presence not substantiated" related to claimed warranty work on 130 vehicles. Debit Deviation Report (JA4838–4932). Yet even after GM requested that Mall Chevy explain the deviations with the forecast of grave consequences for inadequate responses, Mall Chevy provided explanations for only 12 of the deviations – and none of those related to warranty work on ghost vehicles. That absence of explanations is telling, but not dispositive.

To further prove the falsity of Mall Chevy's claims for warranty repairs, GM produced sworn statements from knowledgeable employees of CarMax, Carvana, and DriveTime. In aggregate, those vendors averred that they had no record of repairs on 96 vehicles that Mall Chevy claimed to have serviced under warranty at their behest. The affidavits from CarMax and Carvana added another layer of detail: 78 of the vehicles that Mall Chevy claimed to have repaired were not even in New Jersey when Mall Chevy stated that it performed the warranty work.[9]

GM also identified a motive and an opportunity for Mall Chevy employees to commit fraud. Because the service advisors and the dispatcher received a commission from Mall Chevy based on the volume of warranty work they performed or managed, they had financial motives to submit false claims for warranty repairs. In addition, GM's dealership-friendly process for warranty claims – which did not require the

_____

[9] In its reply brief, Mall Chevy argues, for the first time, that the three used-car dealers do not keep complete records, so the lack of records is minimally probative. Putting argument-forfeiture concerns aside, this argument mischaracterizes the record, which supports at most the conclusion that the used-car dealers did not have complete *paper* records, not that the dealers' complete recordkeeping systems – paper and electronic – were incomplete.

submission of job cards and other supporting evidence of the repairs – presented an opportunity to fabricate claims for warranty repair work on ghost vehicles. And much of the information needed to make a claim for a warranty repair on a ghost vehicle was available online: used-car dealerships post vehicle identification numbers and odometer readings for vehicles in their inventory, along with those dealers' names and contact information.

Beyond motive and opportunity, there is a clincher – the text message from former service advisor Ray Moffatt on May 16, 2017. That message lamented that Mall Chevy's general manager "knows everything, the truth," and it communicated that Moffatt quit that day. Screenshot of Moffatt Text Message (JA6616). Moffatt closed the message with the sentiment, "Sorry guys good while it lasted." *Id.* Those few words conveyed a great deal: in context, they operate as an admission by Moffatt that he was involved with others at Mall Chevy in submitting false warranty claims.

Also, Mall Chevy's conduct after GM's May 2017 letters is consistent with the coordinated submission of false warranty claims by its employees.[10] In the three weeks after its receipt of GM's May 19 letter describing job-card deviations, four employees in its service department, including Moffatt, no longer worked there. One of them was the dispatcher, who received commissions based on the amount of warranty work that Mall Chevy performed. Two of them, including the dispatcher, received Moffatt's text message.

Finally, the testimony of Mall Chevy's general manager, who was its corporate representative for a Rule 30(b)(6) deposition, admitted that one of the four claims that GM

---

[10] In opposing summary judgment, Mall Chevy did not object to the consideration of this evidence. *Cf.* Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 407 (allowing for the exclusion of evidence of subsequent remedial measures).

identified as fraudulent was indeed false. *See* Fed. R. Civ. P. 30(b)(6). He testified that "once [he] investigated this claim, it was easy to determine that it was false," Colender Dep. 213:8–10 (JA4295), because the job card associated with that claim "was false," *id.* at 237:9–15 (JA4301).

In response to that avalanche of evidence of its false claims for warranty repairs on ghost vehicles, Mall Chevy musters only incomplete and feeble answers. It relies on the deposition testimony of the former dispatcher. He testified that he had a specific memory of working on *one car* that CarMax stated was in Denver, Colorado, at the time Mall Chevy claims it did a repair. At most, that testimony would create a genuine dispute for one of the 96 ghost vehicles identified by CarMax, Carvana, and DriveTime. That statement does nothing to call into question the evidence regarding the other ghost vehicles.

Mall Chevy also looked to Moffatt's deposition to create a genuine issue of material fact. Moffatt testified that he "assume[d]" he had performed these repairs, but he did not "have definitive proof" that each vehicle was at Mall Chevy. Moffatt Dep. 124:24–25 (JA7141). Because Moffatt hedged and speculated, those statements do not create a genuine dispute regarding the falsity of warranty claims for any of the ghost vehicles. *See Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018) (holding that "[b]are assertions, conclusory allegations, or suspicions will not suffice" to create a genuine issue of fact for trial (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 269 (3d Cir. 2014))); *Gonzalez v. Sec'y of Dep't of Homeland Sec.*, 678 F.3d 254, 264 (3d Cir. 2012) (explaining that "bare and self-serving" testimony does not create a genuine dispute of material fact where there is also strong, contradictory "circumstantial evidence"). Moffatt's most specific responsive testimony – that "*[i]f* [he] wrote it up *and had keys*, then . . . [he] did do the work" – also did not discredit GM's ghost-vehicle theory of fraud. Moffatt Dep. 125:2–3 (emphasis added) (JA7141). That testimony was conditioned on Moffatt having the keys, yet if he had the keys,

then the vehicle would have already been at Mall Chevy, and it would not be a ghost vehicle.  Thus, that testimony, even on its own terms, did not address GM's evidence that Mall Chevy submitted false warranty claims for ghost vehicles.  For these reasons, Moffatt's testimony does not prevent summary judgment in favor of GM.  *See In re Weinstein Co. Holdings LLC*, 997 F.3d 497, 510 (3d Cir. 2021) ("[T]he summary judgment standard does not require a court to draw improbable inferences.").

The location information on the job cards likewise did not generate a genuine dispute of material fact.  The job cards for the ghost vehicles indicate that each of the vehicles was at Mall Chevy on the day of the claimed warranty repair.  But in opposing summary judgment, Mall Chevy did not rely on the location information from the job cards, so it forfeited that argument.  And even if Mall Chevy had offered the job cards for their truthfulness, GM could have objected since those out-of-court statements about the location of the vehicles would be hearsay.  *See* Fed. R. Evid. 801(c) (defining 'hearsay'), 802 (declaring that hearsay is inadmissible); *cf. id.* 803(6)(E) (making inapplicable the business-records exception when the opponent shows that "the source of information or the method or circumstances of preparation indicate a lack of trustworthiness").

For these reasons, GM has met its burden on the summary-judgment record under the standard method: it demonstrated undisputed facts that Mall Chevy submitted false warranty repair claims for ghost vehicles, and as matter of law, that constitutes good cause to terminate the franchise agreement.

## 2. A Franchisor May Rely on Evidence Acquired after a Notice of Termination to Prove Good Cause for the Termination of a Motor Vehicle Franchise.

To avoid summary judgment on its wrongful-termination claim, Mall Chevy argues that the sworn statements from the used-car dealers cannot be considered at summary judgment. According to Mall Chevy, two statutory provisions bar a franchisor from proving good cause through the use of evidence that it did not identify in its notice of termination. First, the Franchise Practices Act requires the franchisor to provide "all the reasons for such termination" in writing 60 days before the termination. N.J. Stat. § 56:10-5. Second, under a 2011 amendment applicable to motor vehicle franchises, to prove good cause, a franchisor is "limited to the grounds for termination set forth in the written notice." *Id.* § 56:10-30(c). So, for Mall Chevy to succeed on this argument, it must establish that one or both of the statutory terms – 'reasons' or 'grounds' – prevents a franchisor from using evidence that it did not identify in its notice of termination.

Neither of those terms extends that far. As understood contemporaneously with the enactment of the Franchise Practices Act in 1971 and the amendment in 2011, neither of 'reasons' nor 'grounds' had a plain meaning that included providing notice of forthcoming evidence (akin to a pretrial disclosure). *See American Heritage Dictionary of the English Language* 1086 (1969) (defining 'reason'); *American Heritage Dictionary of the English Language* 775 (4th ed. 2009) (defining 'ground'). Nor did the specialized legal usage of those terms at those times have such a meaning. *See Reason*, *Black's Law Dictionary* (4th ed. 1968); *Ground, Black's Law Dictionary* (9th ed. 2009). And without any other basis for interpreting those terms more broadly, neither statutory provision bars GM from using evidence that it later obtained to support the reasons and grounds that it identified in its notice

23

of termination.[11]  Thus, it is unnecessary to assess whether summary judgment on the wrongful-termination claims could be sustained without the sworn statements from the used-car dealers.[12]

---

[11] As an alternative to addressing the question of a franchisor's ability to rely on after-acquired evidence to support its decision to terminate a franchise, Mall Chevy has moved this Court to certify this question to the New Jersey Supreme Court.  *See* N.J. Ct. R. 2:12A-1 (allowing certification of questions of law from the Third Circuit to the New Jersey Supreme Court).  But as explained above, this legal issue has a clear answer and therefore does not merit certification.  *See United States v. Defreitas*, 29 F.4th 135, 141 (3d Cir. 2022) ("Certifying a question where the answer is clear is inappropriate and unnecessary."); *Travelers Indem. Co. of Ill. v. DiBartolo*, 171 F.3d 168, 169 n.1 (3d Cir. 1999) (refusing to certify a question of state law because "the issue was [not] sufficiently difficult to command the attention of [the state's highest court]").  Accordingly, that request will be denied.

[12] In a footnote in its opening brief followed by two paragraphs in its reply brief, Mall Chevy asserts that GM's reliance on the affidavits violates the after-acquired evidence doctrine.  But Mall Chevy provides no support for the proposition that New Jersey courts apply that doctrine to claims other than those based on invidious discrimination in employment.  *See Redvanly v. Automated Data Processing, Inc.*, 971 A.2d 443, 447–48 (N.J. Super. Ct. App. Div. 2009) (applying the doctrine in the context of employment discrimination); *see generally McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 357 (1995) (developing the after-acquired evidence doctrine in the context of a claim for age discrimination in employment, but only after recognizing that the legislation authorizing the claim was "part of an ongoing congressional effort to eradicate discrimination in the workplace" and that it "reflect[ed] a societal condemnation of invidious bias in employment decisions").  Accordingly, that doctrine as developed under

### 3. The Dealer Operator, Charles Foulke, Is Not the Franchisee, and the Wrongful Acts of Mall Chevy's Employees Are Attributed to Mall Chevy for Purposes of Establishing Good Cause.

To salvage its wrongful-termination claim, Mall Chevy offers a two-part argument against good cause. It contends, first, that the dealer operator, Charles Foulke – not Mall Chevy – was the franchisee. From there, Mall Chevy asserts that even if its employees committed the fraud, they were rogues who acted without Foulke's knowledge or approval such that those acts do not amount to good cause for terminating the franchise agreement.

The first component of the argument – that Foulke was the franchisee – conflicts with Mall Chevy's prior positions in this case, is incorrect, and is ultimately self-defeating. Mall Chevy's complaint alleges no fewer than six times that Mall Chevy, not Foulke, is the franchisee. And Mall Chevy did not seek to amend those allegations, as would be necessary to take such a contrary factual position. *See Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 181 (3d Cir. 2008); *Parilla v. IAP Worldwide Servs., VI, Inc.*, 368 F.3d 269, 275 (3d Cir. 2004). Also, the franchise agreement, which identifies Mall Chevy as the dealer and Foulke as the dealer operator, makes clear that the dealer operator is not a party to the agreement:

New Jersey law does not apply in this context to bar GM's use of sworn statements from used-car dealers to corroborate its previously disclosed premise that Mall Chevy's false claims justified termination of the franchise.

> Although this Agreement is entered into in reliance on the personal services of the Dealer Operator, the Dealer entity specified in this Agreement is the *only party* to this Agreement with General Motors.

Dealer Sales and Service Agreement 2015, Standard Provisions, Art. 2 (emphasis added) (JA147). So Foulke, who was not even a party to the franchise agreement, was not the franchisee. Finally, if Foulke were the franchisee, then all of Mall Chevy's statutory claims would fail because the statute allows only franchisees to sue for statutory violations. *See* N.J. Stat. § 56:10-10 ("Any franchisee may bring an action against its franchisor for violation of this act . . . ."); *see also Tynan v. Gen. Motors Corp.*, 591 A.2d 1024, 1025, 1029–31 (N.J. Super. Ct. App. Div. 1991) (holding that a plaintiff other than a franchisee as defined by the Act lacks standing to bring a claim under the Act against a franchisor), *rev'd in part on other grounds*, 604 A.2d 99, 100 (N.J. 1992) (per curiam). So rather than rescuing Mall Chevy's wrongful-termination claim, the counterfactual hypothesis that Foulke was the franchisee would prevent Mall Chevy, as an entity other than the franchisee, from suing under the Franchise Practices Act. For these reasons, Mall Chevy fails to establish the first necessary component of its argument, and there is no need to address the second half of its contention.[13]

---

[13] Mall Chevy's alternative request to certify this issue to the New Jersey Supreme Court will be denied. With Mall Chevy as the franchisee, there is no need to address whether the actions of non-managerial, rogue employees that were unknown to the franchisee can provide good cause for a franchisor to terminate a franchise.

### B. Mall Chevy's Failure to Substantially Comply with the Franchise Agreement Bars Its Remaining Claims.

Mall Chevy also appeals the District Court's entry of summary judgment on its three other statutory claims. One of those claims (Count V) sought to enjoin GM from charging back Mall Chevy $656,033 in warranty claims on the grounds that GM did not substantiate the chargebacks in violation of N.J. Stat § 56:10-15(f). The other two claims sought damages for imposing unreasonable performance standards in violation of § 56:10-7.4(a) (Count II), and for using an arbitrary and unreasonable process to gauge performance in violation of § 56:10-7.4(d) (Count III).

While the Franchise Practices Act expressly allows franchisees to sue franchisors for violating its provisions, *see* N.J. Stat. § 56:10-10, it also provides franchisors a defense to all such claims, *see id.* § 56:10-9. Under that defense, a franchisor may avoid liability for any claim under the Act if the franchisee has not substantially complied with the franchise agreement:

> It shall be a defense for a franchisor, to any action brought under this act by a franchisee, if it be shown that said franchisee has failed to substantially comply with requirements imposed by the franchise and other agreements ancillary or collateral thereto.

*Id.*; *see Maintainco, Inc. v. Mitsubishi Caterpillar Forklift Am., Inc.*, 975 A.2d 510, 518 (N.J. Super. Ct. App. Div. 2009) ("For any claim, the franchisor may assert as a defense that 'said franchisee has failed to substantially comply with requirements imposed by the franchise and other agreements ancillary or collateral thereto.'" (quoting N.J. Stat. § 56:10-9)); *Simmons v. Gen. Motors Corp., Oldsmobile Div.*, 435 A.2d 1167, 1178 (N.J. Super. Ct. App. Div. 1981) (recognizing that the statutory provision provides a complete defense to any claims brought

under the Franchise Practices Act); *see also New A.C.*, 263 F.3d at 320 n.11 (characterizing § 56:10-9 "as a complete defense in 'any action' instituted under the [Franchise Practices Act] by a franchisee").

That defense applies here to bar Mall Chevy's remaining statutory claims. Through the franchise agreement, Mall Chevy agreed "to timely submit true and accurate . . . claims for payments." Dealer Sales and Service Agreement 2015, Standard Provisions, Art. 11.2 (JA159). And by seeking reimbursement for warranty repair work on ghost vehicles, Mall Chevy violated that term because "the false information was submitted to generate a payment to [Mall Chevy] for a claim which would not otherwise have qualified for payment." *Id.*, Art. 14.5.5 (JA165). Thus, in submitting false claims, Mall Chevy did not substantially comply with the contract, and its other statutory claims are foreclosed by the defense.[14]

Mall Chevy disputes that outcome. It argues that the § 56:10-9 defense does not apply to chargeback claims, which were added to the Act by later legislation. But as long as that addition of the chargeback provision, codified at § 56:10-15(f), was within the Franchise Practices Act, then the defense would apply. *See* N.J. Stat. § 56:10-9 (providing a complete defense for franchisors against "any action brought under this *act*" (emphasis added)). And the legislation adding § 56:10-15(f) was explicit that the chargeback-protection provision operated as an amendment to the Franchise Practices Act. *See* Act of

---

[14] Because the § 56:10-9 defense bars Mall Chevy's other statutory claims, it is unnecessary to consider the additional arguments that Mall Chevy raises on appeal relating to those claims, *viz.*, that the District Court erred by denying Mall Chevy's jury trial request for its unsubstantiated-chargebacks claim that sought only injunctive and declaratory relief and that the District Court erred in granting summary judgment to GM on these claims by finding that Mall Chevy had not offered proof of compensatory damages.

Mar. 12, 1999, ch. 45, § 3, 1999 N.J. Laws 270, 272, 274 (stating that the 1977 supplement to the Franchise Practices Act "is amended" to add, among other things, the provision codified at § 56:10-15(f)). So, the statutory basis for the chargeback claim, § 56:10-15(f), is part of the Franchise Practices Act and is therefore subject to the § 56:10-9 defense.

As a last resort, Mall Chevy urges disregard of the plain statutory text of § 56:10-9. It argues that a literal interpretation of the defense would lead to an absurd result: motor vehicle franchisors will be able to make chargeback claims as soon as a franchisee fails to substantially comply with a franchise agreement – even if the non-compliance is unrelated to the chargebacks. *See Mercedes-Benz of N. Am., Inc. v. Dep't of Motor Vehicles ex rel. Fifth Ave. Motors, Ltd.*, 455 So. 2d 404, 410–11 (Fla. Dist. Ct. App. 1984) (reasoning that a "literal interpretation" of § 56:10-9 "would undo the New Jersey legislature's attempt to correct the unequal bargaining power between franchisors and franchisees" and "would result in an almost absurd interpretation"). Mall Chevy further contends that such an outcome would contradict the codified purpose of the Franchise Practices Act, which recognized the "disparity of bargaining power between national and regional franchisors and small franchisees." N.J. Stat. § 56:10-2.

The absurdity is not there. This is not a situation where the nexus is lacking between the failure to substantially comply and the proposed chargebacks – Mall Chevy's false claims were the basis for the chargebacks. And as the New Jersey Supreme Court has recognized, the Franchise Practices Act does not protect franchisees "who have lost their franchises as a result of their own neglect or misconduct." *Dunkin' Donuts*, 495 A.2d at 72.

More broadly, there is nothing absurd about the § 56:10-9 defense barring statutory claims for unsubstantiated chargebacks, even in the absence of a nexus. The Franchise Practices Act supplements the common-law causes of action,

29

which would otherwise be available to franchisees to recover unsubstantiated chargebacks. *See Simmons*, 435 A.2d at 1169 (recognizing claims by motor vehicle franchisee for breach of contract and for unlawful termination under the Franchise Practices Act). *But cf.* N.J. Stat. § 56:10-12 (identifying limited circumstances in which causes of action other than those provided in the Act are barred). With recourse available under the common law, Mall Chevy's inability to pursue a statutory cause of action based on an unrelated failure to substantially comply with the franchise agreement is hardly a situation "where the absurdity and injustice of applying the provision to the case would be so monstrous, that all mankind would, without hesitation, unite in rejecting the application." 1 Joseph Story, *Commentaries on the Constitution of the United States*, § 427, at 303 (2d ed. 1851); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts*, § 37, at 237–38 (2012).

For similar reasons, the § 56:10-9 defense bars the remaining statutory claims that Mall Chevy seeks to revive on appeal. Those claims for imposing unreasonable performance standards in alleged violation of § 56:10-7.4(a) and for using an arbitrary and unreasonable process to gauge performance in alleged violation of § 56:10-7.4(d) were likewise based on statutory amendments to the Franchise Practices Act. *See* Act of Mar. 12, 1999, ch. 45, § 5, 1999 N.J. Laws 276, 277 (adding to the Franchise Practices Act, among other things, the provisions codified at § 56:10-7.4(a) and (d)). They are thus subject to the § 56:10-9 defense. And it is not absurd to bar those claims based on Mall Chevy's submission of false claims for warranty work on ghost vehicles, especially in light of the availability of alternative modes of redress for Mall Chevy under common-law causes of action.

## IV. CONCLUSION

For these reasons, we will affirm the judgment of the District Court.